UNITED STATES of America,
Plaintiff,

v.

WESTLANDS WATER DISTRICT,
Defendant.

Westlands Water District,
Counter-claimant,

v.

United States of America,
Counter-defendant.

No. CV–F–89–172 OWW.

United States District Court,
E.D. California.

March 13, 2001.

Barry M. Hartman, U.S. Dept. of Justice, Land and Natural Resources Div., Washington, DC, Maria A Iizuka, United States Dept. of Justice, Environment and Natural Resources Div., Sacramento, CA, for U.S. on Behalf of U.S. Small Business Admin., Department of Interior.

Thomas William Birmingham, Kronick Moskovitz Tiedemann and Girard Sacramento, CA, for Westlands Water Dist.

Jerry E Henry, Fresno, CA, for Hubert Beene and Sons, Gary Hughes.

William M Smiland, Theodore A Chester, Jr., Smiland and Khachigian, Los Angeles, CA, for Boston Ranch Co.

Denslow B Green, Green Green and Rigby, Madera, CA, for Sharon Combs, Micah Combs, Fortune #1, Houlding Farms #2, Houlding Farms #3, Houlding

Farms #4, Houlding Farms Inc., Dennis H. O'Neill, Jr., VF Farms.

William M Smiland, Smiland and Khachigian, Los Angeles, CA, for South Boston Co., S. Stamoules and Co., Westhaven Farming Co.

Vicky Seasholtz, Fresno, CA, pro se.

J O Seasholtz, Fresno, CA, pro se.

George J Seasholtz, Fresno, CA, pro se.

## AMENDED MEMORANDUM DECISION AND ORDER RE: JULY 3, 2000, CROSS–MOTIONS FOR SUMMARY JUDGMENT AND FOR RECONSIDERATION

WANGER, District Judge.

This decision and order amends the decision and order filed March 2, 2001 (Doc. 346).

### INTRODUCTION

This matter. is before the Court on the cross-motions for summary judgment submitted by Plaintiff and the Boston Ranch Parties[1] (who are Defendants, Counterclaimants, and Third–Party Plaintiffs) as to the disposition of $9,679,000 held by the Court in escrow, see Doc. 328 ¶ 1 (government's statement of undisputed facts in support of motion for summary judgment).[2] Oral argument was held on Monday, August 28, 2000.

### I. THE CLAIMS

The dispute underlying this action concerns: (1) the price per acre-foot the United States Department of the Interior ("Interior"), Bureau of Reclamation ("Bureau"),[3] is permitted to charge waterusers who take water from the San Luis Unit of the United States Central Valley Project ("CVP"); and (2) a drainage-charge component. Interior argues 43 U.S.C. § 390ww(h), enacted in 1987, which requires the Secretary of the Interior to collect the "full cost" for providing all federal (including CVP) water, establishes the price. See Doc. 1. The water-users are members of Westlands Water District ("Westlands"),[4] interpled into this action by defendant Westlands, and contend that the price was fixed at $8.00 per acre-foot by a 1963 water-service contract between Westlands and the Bureau ("1963 Contract"), authorized by the Reclamation Act of 1902, 32 Stat. 388, former 43 U.S.C. §§ 371–616 (1902), which authorizes Interior and the Bureau to contract with water districts (not individual water-users) for water service from a federal reclamation project. See, e.g., 43 U.S.C. § 485h(e) (2000).

The United States brought this action against Westlands on February 27, 1989, after Westlands refused to pay "full cost" for CVP water furnished under the 1963 Contract. It sought: (1) a declaratory judgment that Westlands violated 43 U.S.C. § 390ww(h) "as a result of its failure to pay full cost to the United States for federal reclamation project irrigation

---

1. The group "Boston Ranch Parties" consists of Boston Ranch Company, S. Stamoules & Company, South Boston Company, and Westhaven Farming Company ("water-users").

2. As of February 22, 2001, the Treasury Bill had a present value of $10,379,000.

3. See Bureau of Reclamation, at http://www.usbr.gov/main/index.html (visited Jan. 10, 2001) (last modified Jan. 8, 2001).

4. See, e.g., Bryan J. Wilson, Westlands Water District and Its Federal Water: A Case Study of Water District Politics, 7 STAN. ENVTL. L.J. 187, 188 (1987/1988) ("Westlands Water District lies on the western edge of California's San Joaquin Valley, southwest of Fresno. It is roughly rectangular, bounded approximately by Interstate 5 on the west and the San Joaquin River on the east.") (citing WESTLANDS WATER DISTRICT, FACTS AND FIGURES 2 (1987)).

water delivered to certain lands located within Westlands Water District which are encumbered by extended recordable contracts," Doc. 1 ¶ 1; and (2) "a money judgment for the difference between the applicable full cost rate and the rate paid by the Westlands Water District for federal reclamation project irrigation water delivered to such lands encumbered by extended recordable contracts," *id.* Westlands collects water charges by assessments on its member water-users, and remits payment to the United States according to ¶¶ 6(a) & (b) of the 1963 Contract.

The water-users object to paying more than the "Contract" price for water services by counterclaims and a third-party complaint against the federal parties, alleging nine causes of action for declaratory relief, *see* Doc. 48, and seeking a refund of any payments made for drainage service after 1986. These claims advance legal theories that 43 U.S.C. § 390ww(h)'s full-cost provision does not apply to the water-users.

In their November 4, 1991, opposition to the government's Motion for Order to Enter Final Judgment, the water-users raised many issues, including whether the term "service" in the 1963 Contract and recordable contracts includes "providing drainage service to recipients." Doc. 141 17:28–18:3 (quoting *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.,* 899 F.2d 814, 823 n. 14 (9th Cir.1990) (hereinafter *"Barcellos"*)); *see also id.* at 38:17–39:10 ("The Original Westlands Landowners Are Not Precluded By The Prior Decision From Litigating The No–Drainage Issue.").

An April 16, 1993, decision on the government's motion for final judgment notes: "the drainage provided by the United States to Westlands has been greatly attacked. To the Court's knowledge, no case had considered the effect upon the respective rights and duties of the parties under the various agreements." Doc. 178 at

15:17–22. By April, 1993, only two triable issues of fact remained: (1) "appropriate issues relating to drainage," *id.* at 15:23–24; and (2) "any issues pertaining to the calculation of the sum owed to the United States, and the calculation of the interest to be paid [to whomever the fund belongs]," *id.* at 16:3–4.

The current cross-summary judgment motions were filed July 3, 2000. *See* Docs. 324–26. The water-users seek summary judgment:

(1) for restitution against the United States, of such amounts equal to the payments by the water-users for drainage service and facilities not provided by the United States;

(2) that the United States breached its contract by failing to perform contractual water-pricing obligations, and that the water-users are entitled to such amounts equal to the water surcharges they paid into the interpled fund; and

(3) they are entitled to interest earned on interpled funds.

*See* Doc. 324 at vii:9–14 (water-users' memorandum in support of partial or summary adjudication of issues). On April 3, 1997, summary judgment was granted against the water-users and for the United States on the second issue (contractual price of water). *See* Doc. 278 at 25:18–27:13. The water-users now move for reconsideration of that decision "in light of the Ninth Circuit's recent *Sumner Peck* decision [and] for other changes of circumstances." Doc. 324 at vii:16–17.

The government seeks summary judgment, alleging the water-users "are not entitled to any of the funds" because:

1. The monies in escrow represent the difference between the contract rate for water deliveries and "full cost," as that term is defined under federal law, and federal law does not vest the Bureau with discretion not to collect full cost for federal water.

2. Regardless whether the counterclaims have a basis in law, there is no independent jurisdiction for the water-users' assertion against the United States, given the *Orff* decision.

3. *Firebaugh Canal Co. v. United States*, 203 F.3d 568 (9th Cir.2000), underscores that compliance by the United States with the San Luis Act did not require construction of the interceptor drain, the action that the water-users asserted was the *quid pro quo* for their having to pay for drainage.

*See* Doc. 327 at 2:3–14 (government's opening brief).

## II. *FACTUAL AND PROCEDURAL BACKGROUND*

This suit arises from the Bureau's administration of the San Luis Unit, a division of the CVP. The CVP is the nation's largest federal reclamation project, spanning "the length of California's Central Valley, from Shasta Dam, in the north, to the Friant–Kern Canal, in the south." *Firebaugh Canal Co.*, 203 F.3d at 570. It "is a multipurpose federal reclamation project consisting of dams, hydroelectric power plants, transmission lines, and irrigation canals." *City of Santa Clara v. Watkins*, 984 F.2d 1008, 1010 (9th Cir.1993). "The grand design of the Project was to conserve and put to maximum beneficial use the waters of the Central Valley of California," *Dugan v. Rank*, 372 U.S. 609, 612, 83 S.Ct. 999, 10 L.Ed.2d 15 (1963), which comprises approximately one-third of California's territory, *see id.*[5]

Construction of the San Luis Unit was authorized by the San Luis Act.[6] The "principal purpose" of the San Luis Unit is to furnish irrigation to land in Merced, Fresno, and Kings counties, California. *See Firebaugh Canal*, 203 F.3d at 570. Westlands is the largest contractor for water from the San Luis Unit. *See id.* at 572. In 1963, Westlands entered into the 1963 Contract with the Bureau to purchase CVP water from the San Luis Unit at a subsidized maximum rate of $8.00 per acre-foot. *See Barcellos*, 899 F.2d at 816; Doc. 141 exhibit B 12:13–16. This rate included a $0.50 drainage service component. *See* Doc. 141 exhibit B 12:14–15. The 1963 Contract is impacted by additional considerations:

First, Section (a) of the San Luis Act requires the Government to provide drainage service to Westlands. "Any water project that brings fresh water to an agricultural area must take the salty water remaining after the crops have been irrigated away from the service area." *Firebaugh Canal*, 203 F.3d at 571.

Second, "[t]he 1963 Contract prohibits the District from furnishing Project water to an owner who wishes to use the water to irrigate his 'excess lands,' or lands in excess of 160 acres, unless the owner agrees in a separate, recordable contract with Interior to certain significant restraints on his rights to the excess lands." *Barcellos*, 899 F.2d at 816 (footnote omitted). Between 1969 and 1974, each of the Third–Party Defendants (Boston Ranch Company,[7] S. Stamoules & Co., South Boston Co., and Westhaven Farming Co.[8]) ex-

---

5. For an in-depth description of the history of the CVP and the lands involved, see *Ivanhoe Irrigation Dist. v. McCracken*, 357 U.S. 275, 279–84, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958).

6. Pub.L. No. 86–488, 74 Stat. 156 (1960).

7. Boston Ranch Company "executed two recordable contracts in 1972, covering 23,711

acres of excess lands." *Barcellos*, 899 F.2d at 816 n. 2.

8. Westhaven Farming Company "executed five recordable contracts in 1973 and 1974, covering 5,556 excess acres." *Barcellos*, 899 F.2d at 816 n. 2.

ecuted a recordable contract with the United States to divest themselves of their excess lands. *See id.* These recordable contracts are identical in every aspect, except for the party's name and description of the property.

> The primary benefit that the landowners receive from the federal reclamation program is the privilege of receiving subsidized water. Having to sell their excess lands within a limited period of time at an artificially low appraised price is an intended burden.

*Id.* at 824. These recordable contracts also have a provision, Article 13, that extends the ten-years period of ownership whenever "water or service from the Project may not be available to the land involved through no fault of the District or the Landowner."

This suit concerns three issues:

(1) the payment rate for San Luis Unit water applicable to excess lands during extension periods, *i.e.*, full-cost or subsidized (the 1963 Contract rate); and if the fund before the court contains any water service payments that should be refunded;

(2) who is entitled to any drainage component payments; and

(3) whether any declaratory relief is appropriate.

### A. *1902: Reclamation Act of 1902* [9]

Any discussion of federal water in California begins in 1902: "The Reclamation Act of 1902 provided the framework for modern day reclamation law." Martin J. Jackley, *Reclamation Law and the Bell Fourche Irrigation District: A Desperate*

*Fight for a Way of Life in Times of Change,* 40 S.D. L. REV. 478, 479 (1995) (footnote omitted). "The final westward migration of the late 1800s resulted in an enormous demand by the settlers for irrigation systems." *Peterson v. United States Dep't of Interior,* 899 F.2d 799, 802 (9th Cir.1990) (citing Paul S. Taylor, *The Excess Land Law: Execution of a Public Policy,* 64 YALE L.J. 477, 481–85 (1955)). "Responding to the pressing demand for federal assistance in funding water reclamation projects, Congress passed the Reclamation Act of 1902." *Id.* (citing 1902 Act).

The 1902 Act had two purposes: "encourage family farming on modest-sized parcels [160 acres];" and "to increase agricultural output by subsidizing the irrigation of formerly arid and unproductive lands." *Barcellos,* 899 F.2d at 824 (citing *Ivanhoe Irrig. Dist.,* 357 U.S. at 275, 78 S.Ct. 1174; *United States v. Tulare Lake Canal Co.,* 535 F.2d 1093 (9th Cir.1976)).[10] "Congress adjusted the balance by amending the Act to authorize Interior to allow larger operators to receive water in exchange for their promise to divest themselves of excess lands." *Id.* (citing 43 U.S.C. § 423e).

Under the 1902 Act, there was very limited regulation of excess lands, because prior to the 1982 RRA, Interior did not regulate leasing of excess lands receiving subsidized water. *See* 32 Stat. 389 (1902) (making landowner eligible for federal project water if he owned less than 160 acres, but not limiting such water delivery to non-leased lands). The Omnibus Adjust-

---

9. Reclamation Act of 1902, Pub.L. No. 57–161, ch. 1093, § 5, 32 Stat. 388 (former 43 U.S.C. §§ 371–573).

10. "The purpose of the original 1902 Act was to encourage people to go West, not to engage in big-time speculation, but to grow crops on modest family farms in the country's drier

regions so that the nation's agricultural bounty would increase." *Id.* at 815 (internal citation omitted). Additional objectives were to widely distribute the benefits of publicly-financed water reclamation projects; promote owner-operated farms; and preclude speculative gain. *See* 35 Cong. Rec. 6758 (June 13, 1902) (statement of Rep. Martin).

ment Act of 1926,[11] the first major amendment to the 1902 Act, partially rectified this problem by introducing the "recordable contract" idea, which required water recipients who owned lands in excess of 160 acres to enter into a contract with Interior in which they agreed to sell their excess lands within ten years at a price not reflecting the availability of project water. *See id.* at 483.

### B. *1963: 1963 Contract*

"Westlands entered into a water service contract with the United States in 1963 under which the United States, through the Bureau of Reclamation, agreed to make available for Westlands' purchase 900,000 acre-feet of water from the San Luis Unit of the Central Valley Project ('CVP')." *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.,* 849 F.Supp. 717, 720 (E.D.Cal.1993), *aff'd, O'Neill v. United States,* 50 F.3d 677 (9th Cir.1995). By this Contract, Interior agreed to provide CVP water to the District for 40 years. Two main provisions of the 1963 Contract are germane to this suit:

(1) a specified volume of water provided at $8.00/acre-foot ($7.50/acre-foot for water service and $0.50/acre-foot for drainage service) in Article 6(a); and

(2) before water could be delivered to "excess lands" (lands in excess of 160 acres), the owner must execute a "recordable contract" to sell those excess lands within ten (10) years at a price that does not consider the water rights (Article 23(a)), or Interior would do so through a

power of attorney granted by the owner (Articles 24–25).[12]

### C. *1976: D.C. District Court Injunction*

On August 9, 1976, the District of Columbia district court issued an injunction preventing approval of any new contracts for excess land sales until the initiation of public rule-making proceedings. *See Nat. Land for People v. Bureau of Reclamation,* 417 F.Supp. 449 (D.D.C.1976).[13] That injunction remained in effect until 1982.

As a result, Interior halted all land sales under recordable contracts nationwide, and did not approve land sales from 1976 through 1984. As ten years of ownership of water users' excess lands began to expire, a problem surfaced: although under the injunction, the water-users were unable to complete sale of their excess lands, they nevertheless continued to receive subsidized water for these excess lands for more than ten years.

### D. *1978: The Interior Department Increases the Water Price*

In 1978, the Solicitor of the Interior Department "issued a legal opinion stating that the $8.00 rate specified in the 1963 Contract was inadequate to recover the escalating costs of the Project and was therefore contrary to the federal reclamation laws, *see* 43 U.S.C. § 461, and not binding." *Barcellos,* 899 F.2d at 817 (citing 1978 "Krulitz opinion"[14]). As a result of this opinion, "the Interior Department began to charge the District between

---

11. 44 Stat. 478 (1926) (amending 1902 Act).

12. Between 1969 and 1974, all water-users entered into recordable contracts that complied with the 1963 Contract. *See Barcellos,* 899 F.2d at 816.

13. This suit was brought by the National Land for People on behalf of several small farmers who were unsuccessful in their at-

tempt to purchase excess lands in the Westlands Water District and sought to prevent Westlands from engaging in questionable land transfers by requiring Interior to promulgate regulations of its approval of Westlands excess lands sales under recordable contracts.

14. *See* 85 Interior Dec. 197, at 297, 1978 WL 27464 (July 31, 1978) (Decision No. M–36901).

$13.30 and $16.40 per acre[-]foot for all Project water." *Id.*

### E. *1979: The Water–Users and Westlands sue to enforce the 1963 Contract's water-pricing provision*

In 1979, the water-users sued Westlands in state court, "seeking among other things to have the $8.00 rate enforced." *Id.* Westlands joined the United States as a party, and the action was later removed to the United States District Court for the Eastern District of California. *See id.*[15]

### F. *1982: Congress passes the Reclamation Reform Act of 1982 ("RRA"): "Full–Cost" water*

In 1982, Congress attempted to address the problems caused by the district court injunction against selling excess lands and the Krulitz opinion recommending full-cost rates for all water, by passing the RRA, 43 U.S.C. §§ 390aa to zz-1,[16] which:

(1) required that water delivered to excess lands be paid for at full-cost; (RRA § 205(a));

(2) extended the time for landowners to dispose of their excess lands for which there were recordable contracts, by not counting the six-year effective period of the district court injunction (1976–1982) against the ten-year period for disposal of excess lands under Article 13 of the recordable contracts (RRA § 209(e)); and

(3) confined eligibility to receive subsidized water for excess lands under the recordable contracts to a total of ten years, regardless whether Article 13 extended the ownership term; but suspended termination of the right to such subsidized water (and a corresponding duty to pay "full cost") until eighteen (18) months after the date when the Secretary began again to approve land sales (RRA § 205(c)).

Section 209(d) superseded the 1976 district court injunction, explicitly requiring Interior to establish rules for disposing of the excess lands under recordable contracts, and extended recordable contracts for a time period equal to the unexpired portion of the ten-year term when the district court injunction took effect. *See* 43 U.S.C. § 390ii (2000).

Section 204 of the RRA also increased the allowable amount of "non-excess" lands from 160 to 960 acres, *see* 43 U.S.C. § 390dd (1986), and applied this acreage limitation to all irrigated lands, whether owned or leased, *see id.* at § bb(6) (1986), closing the loophole that previously existed under the 1902 Act.

In the 1982 RRA, Congress also added the so-called "hammer clause," section 203(b), codified at 43 U.S.C. § 390cc (2000), in conference committee,[17] which gave districts with water contracts predating the effective date of the RRA a choice to either voluntarily and irrevocably elect to amend their contracts to comply with the RRA's "full-cost" provisions for excess lands (and enjoy § 204's increased 960–acre limitation for non-excess lands), or remain under the 1902 Act, with its 160–acre limitation. *See* 43 U.S.C. §§ 390cc(a) & (b) (2000).[18]

---

**15.** The action was captioned: *Barcellos & Wolfsen, Inc. v. Westlands Water Dist.*, No. CV–F–79–106 EDP (E.D.Cal.).

**16.** Before the 1982 RRA, federal reclamation law was primarily comprised of the 1902 RRA, 32 Stat. 388, as amended by: (1) the Omnibus Adjustment Act of 1926, 44 Stat. 636; and (2) the Reclamation Project Act of 1939, 53 Stat. 1187.

**17.** *See* S. Con. Rep. No. 568, 97th Cong., 2d Sess. 5 (1982).

**18.** These sections read:
 (a) Generally
 The provisions of this subchapter shall be applicable to any district which—
 (1) enters into a contract with the Secretary subsequent to October 12, 1982;
 (2) enters into any amendment of its contract with the Secretary subsequent to Octo-

Interior resumed approval of excess land sales in July, 1984. *See* Doc. 1 ¶ 20; Doc. 48 ¶ 25.

### G. *1986: The 1986 Barcellos Consent Judgment Re–Establishes the 1963 Contract Water Price*

Interior rescinded the 1978 Krulitz opinion on June 17, 1986 ("Tarr recission"). *See Barcellos*, 899 F.2d at 819. On July 24, 1986, the parties reached a global (water rate, drainage, and excess lands) settlement memorialized by a stipulated judgment in the 1979 action (the "1986 *Barcellos* Judgment"), which was entered December 30, 1986. *See id.*[19] First, the parties stipulated:

> The 1963 Contract is a valid, enforceable and implementable contract entitling the District through the end of 2007 to water and other service by the United States as specified therein.

ber 12, 1982, which enables the district to receive supplemental or additional benefits; or

(3) which amends its contract for the purpose of conforming to the provisions of this subchapter.

(b) Amendment of existing contracts

Any district which has an existing contract with the Secretary as of October 12, 1982, which does not enter into an amendment of such contract as specified in subsection (a) of this section shall be subject to Federal reclamation law in effect immediately prior to October 12, 1982, as that law is amended or supplemented by sections 209 through 230 of this title [43 U.S.C.A. §§ 390ii to 390zz–1, 373a, 422e, 425b, 485h]. Within a district that does not enter into an amendment of its contract with the Secretary within four and one-half years of October 12, 1982, irrigation water may be delivered to lands leased in excess of a landholding of one hundred and sixty acres only if full cost, as defined in section 390bb(3)(A) of this title, is paid for such water as is assignable to those lands leased in excess of such landholding of one hundred and sixty acres: Provided, That the interest rate used in computing full cost under this subsection

Doc. 141 exhibit E at 12 ¶ 4.1.[20] The 1986 *Barcellos* Judgment prescribes three distinct water prices, depending on the type of land to which the water was delivered (original Westlands area, lands electing to come under the 1982 RRA's "discretionary" provisions, and former Westplains lands[21]):

(1) Article 4.1 provides that "the District and the United States shall perform the 1963 Contract;"

(2) Article 4.2 provides that any water delivered to the former Westplains area (referred to as Areas 2A and 2B) is governed by Articles 4.4 and 4.5 below;

(3) Article 4.4 specifies: "The agricultural water service component of the rates to be paid to the United States for water delivered under Article 3 of the 1963 Contract to lands *which become subject to the Discretionary Provisions of the 1982 Act*[22] shall be

shall be the same as provided in section 390ee(a)(3) of this title.
*Id.*

**19.** 79–106 Doc. 412.

**20.** Congress approved the 1986 Stipulated Judgment by inaction, because under Public Law 99–190, § 122, Congress had 30 days to act after the Judgment was submitted to it, but did not stop its effectiveness.

**21.** *See, e.g.,* Bryan J. Wilson, *Westlands Water District and Its Federal Water: A Case Study of Water District Politics,* 7 STAN. ENVTL. L.J. 187, 197 (1987/1988) (discussing boundaries of original Westlands and Westplains areas, which merged into present-day Westlands).

**22.** Interior intended the so-called "hammer clause" to encourage compliance with the new acreage and pricing limitations of the 1982 RRA, *see* 128 Cong. Rec. 26,073 (Sept. 29, 1982) (statement of Rep. Udall), by giving water contractors a choice: voluntarily and irrevocably elect to amend their contracts to comply with the RRA's full-cost pricing provisions for excess lands in order to take advantage of the expanded acreage limitations (960 acres), *see* 43 U.S.C. § 390cc(b) (2000), or continue to receive water at the subsidized

the higher of (a) $7.50 per acre foot or (b) the appropriate rate as of the date of delivery established pursuant to the 1982 Act [full-cost];"

(4) Article 4.5 provides that water for Municipal and Industrial Uses "shall be paid for ... at the applicable Central Valley Project water rate *as of the date of delivery.*"

Doc. 141 exhibit E at 13–14 (1986 Judgment). The water-users in this case initially chose not to be "hammered" into a 1982 RRA election; *i.e.*, did not irrevocably elect to amend their contracts to subject recordable contract lands in excess of 160 acres to the full cost provisions. *See* Doc. 48 ¶ 26.[23] The water-users all owned original Westlands lands (Areas 1A or 1B). *See id.* at ¶ 15. Under the 1986 Judgment, the water-users are governed by the 1963 Contract's $8.00/acre-foot rate. The Judgment also provided for:

refunds to landowners of all water payments in excess of the $8.00 contract rate made since the time of the Krulitz opinion, including ... payments in excess of the $8.00 rate for water used on excess lands controlled by the landown-

ers for the extended period provided in § 209(e) of the Act.

*Barcellos,* 899 F.2d at 819; *see also* Doc. 141 exhibit E ¶¶ 8–9, at 32–36.

Neither the 1986 Judgment nor the 1963 Contract has a provision that explicitly addresses the United States' sovereign power to legislate. *But see infra* Part IV.F.3.c.

H. *1987: Congress Re-sets the water price at "Full Cost" for excess lands under recordable contract*

On December 22, 1987, less than one year after entry of the *Barcellos* Judgment, Congress amended federal reclamation law through the Omnibus Budget Reconciliation Act of 1987[24] by adding section 224(h), codified at 43 U.S.C. § 390ww(h) (2000). Section 224(h) requires the Secretary of the Interior to collect "full cost" for federal reclamation water delivered to excess lands under pre-RRA recordable contracts. *See* 43 U.S.C. § 390ww(h) (2000).[25] It does this by applying section 205[26] of the 1982 RRA to "all recordable contracts executed prior to October 12, 1982."[27] Section 205(a) mandates collecting the "full cost" rate for water as defined by the statute,[28] a substantially higher amount

---

contract rate under the 160–acre pre-RRA (1902 Act as amended) regime.

**23.** Boston Ranch sold approximately 20,280 acres of excess lands in May, 1989, and 2,848 excess lands in November, 1989. *See* Doc. 48 ¶ 39. However, on January 23, 1990, Boston Ranch executed an election to subject its remaining 632 acres to the discretionary provisions of the 1982 RRA.

In 1986, S. Stamoules & Company gifted 160 acres of land. *See id.* at ¶ 40. In January, 1988, it distributed approximately 960 acres to each of its individual partners, who elected to subject those lands to the discretionary provisions of the 1982 RRA. *See id.*

South Boston Company and WestHaven sold the last of their excess lands in approximately 1992.

**24.** Pub.L. No. 100–203, 101 Stat. 1330.

**25.** It did, however, provide that Interior "shall not seek reimbursement for any amounts due under this subsection ... which was due prior to December 22, 1987." *Id.*

**26.** Section 205(a) of the RRA states in relevant portion:

(a) Notwithstanding any other provision of law, any contract with a district entered into by the Secretary [of Interior] ... shall provide for the delivery of irrigation water at full cost ... to [excess lands]

43 U.S.C. § 390ee(a) (2000).

**27.** This amendment was probably necessary because § 203(b) stated that 1982 RRA §§ 209–30 govern contracts executed before the RRA's enactment date, but did not include § 205(c) (the "full cost" requirement) as one of those sections.

**28.** "Full cost" is defined as:

than the cost provided by the 1986 *Barcellos* Judgment and the 1963 Contract. *See* Doc. 15 at 1–2. As of 1987, the full-cost rate was approximately $42.00 per acre-foot, *see Barcellos*, 899 F.2d at 819, a rate over five times the contractual rate, which includes operation, maintenance, and replacement charges, *see* 43 U.S.C. § 390bb(3)(A) (2000).

Aside from the "full cost" requirement, section 205(c) also limited the water-users to a total of ten years of subsidized water for their excess lands, regardless of any ownership extension period provided by Article 13 of the recordable contracts. *See id.* at § 390ee(c).

Shortly after RRA § 224(h) (43 U.S.C. § 390ww(h)) was enacted, Westlands brought a motion in *Barcellos* to specifically enforce the 1986 *Barcellos* Judgment, arguing that the Judgment constrained the United States to charge only the water-service rates specified in the 1986 Judgment and the 1963 Contract, $8.00 per acre-foot. *See Barcellos*, 899 F.2d at 819. Westlands argued that section 224(h) could not be applied to abrogate the 1986 *Barcellos* Judgment; *see id.* at 820, because before the time section 224(h) was enacted, a judgment that ordered Interior to perform the terms of the 1963 Contract had already been entered. In the alternative, Westlands alleged if section 224(h) applied to the 1963 Contract and the 1986 *Barcellos* Judgment, then it impaired the obligation of the Judgment, a contract, violating due process and separation of powers. *See id.*

The District Court denied Westlands relief. An appeal followed. *See id.*

### I. 1989: The Instant Suit

After the *Barcellos* appeal was filed, in 1989, the United States brought this action against Westlands Water District: First, for a declaratory judgment that Westlands violated RRA section 224(h)[29] "as a result of its failure to pay full cost to the United States for federal reclamation project irrigation water delivered to certain lands located within Westlands Water District which are encumbered by extended recordable contracts," Doc. 1 ¶ 1; and second, for a "money judgment for the difference between the applicable full cost rate and the rate paid by the Westlands Water District for federal reclamation project irrigation water delivered to such lands encumbered by extended recordable contracts," *id.*

Westlands moved to stay the action pending the *Barcellos* appeal. *See* Doc. 5. The motion for stay was denied. *See* Doc. 15 at 4.

### J. 1989: The Counter-claims, Request for Interpleader, and the Joinder of, inter alia, the Water–Users

On July 10, 1989, Westlands answered the complaint and filed a "counterclaim for interpleader." *See* Doc. 19. It requested that: (1) "the court order that Water Users be made party defendants to respond to the complaint and to [the instant] counterclaim;" (2) "the United States and

---

an annual rate as determined by the Secretary that shall amortize the expenditures for construction properly allocable to irrigation facilities in service, including all operation and maintenance deficits funded, less payments, over such periods as may be required under Federal reclamation law or applicable contract provisions, with interest on both accruing from October 12, 1982, on costs outstanding at that date, or from the

date incurred in the case of costs arising subsequent to October 12, 1982: *Provided,* That operation, maintenance, and replacement charges required under Federal reclamation law, including this subchapter, shall be collected in addition to the full cost charge.

43 U.S.C. § 390bb(3)(A) (2000).

**29.** 43 U.S.C. § 390ww(h) (2000).

Water Users be required to interplead and settle among themselves their respective rights to the money collected by Westlands;" (3) "the court adjudge who is entitled to the sum collected by Westlands;" (4) "the court discharge Westlands from all liability except to the person(s) the court shall adjudge entitled to the sum of money;" and (5) "Westlands recover its costs and attorneys' fees." *Id.*

■■■■ Because Westlands maintained that Section 390ww(h) did not apply to it, beginning July 28, 1989, Westlands began depositing with the Court assessment monies it collected from the water-users that they requested Westlands withhold from the United States. *See* Doc. 25. On September 15, 1989, the court held that Westlands had "the right to [inter]plead the interested party." Doc. 30 at 5.[30]

On November 3, 1989, Westlands filed a second amended counterclaim. *See* Doc. 38. It named, *inter alia,* water-users Boston Ranch Company, S. Stamoules & Company, South Boston Company, and Westhaven Farming Company. On January 26, 1990, the water-users, including the Boston Ranch parties, replied to the second amended counterclaim, *see* Doc. 47, and filed a counterclaim and third-party complaint against the federal parties, *see* Doc. 48. The water-users alleged nine causes of action for declaratory relief, seeking to avoid application of Section 390ww(h)'s full-cost provision. *See id.*

### K. *1990: Issuance of the Stay and the Barcellos Opinion*

On May 11, 1990, the parties stipulated to a stay pending the outcome of the *Barcellos* appeal. *See* Doc. 110.

The *Barcellos* appellate decision issued March 16, 1990, and was amended June 7, 1990, on denial of rehearing and rehearing *en banc. See Barcellos,* 899 F.2d at 814. In a divided opinion, the Ninth Circuit rejected the water users' contentions that RRA section 224(h)[31] did not apply to the 1963 Contract: "There is no fairly debatable construction of § 224(h) that would exempt the [water-users] from its provisions." *Id.* at 821. The Ninth Circuit also rejected the claim that section 224(h), as applied to the water users, was unconstitutional. *See id.* "To prevail in their claim that § 224(h) deprived them of their contract right to water at $8.00 per acre foot for excess lands receiving water for more than ten years, the [water-users] must first, of course, demonstrate that they *had* such a contract right before the enactment of § 224(h)." *Id.* (citing *Nat'l R.R. Passenger Corp. v. Atchison, Topeka & Santa Fe Ry. Co.,* 470 U.S. 451, 105 S.Ct. 1441, 84 L.Ed.2d 432 (1985)) (emphasis in original). Then, "[i]f they can demonstrate they had such a right, they must then show a substantial impairment of that right." *Id.* (citing *Nat'l R.R. Passenger Corp.,* 470 U.S. at 451, 105 S.Ct. 1441). The Court of Appeals found the water-users: "never had a contractual right to receive more

---

**30.** A party seeking to bring an interpleader action under Rule 22 of the Federal Rules of Civil Procedure must first establish federal jurisdiction over its claims. *See Aetna Life Ins. Co. v. Bayona,* 223 F.3d 1030, 1033 (9th Cir.2000). Here, there is federal court jurisdiction because federal reclamation law is at issue. Once federal question jurisdiction is established, "Rule 22(1) interpleader allows a party to join all other claimants as adverse parties when their claims are such that the stakeholder may be exposed to multiple liabil-

ity." *Gelfgren v. Republic Nat'l Life Ins. Co.,* 680 F.2d 79, 81 (9th Cir.1982). A defendant exposed to "double or multiple liability" may obtain .Rule 22 interpleader by way of cross-claim or counterclaim. *See* FED. R. CIV. P. 22(1). Here, Westlands could be exposed to double liability as both the United States and the water-users want it to return the water service assessments it has collected. Interpleader of the water-users is appropriate.

**31.** 43 U.S.C. § 390ww(h) (2000).

than ten years of water for their excess lands, [and] Congress, in enacting § 224(h), did not deprive them of a property right within the meaning of the fifth amendment." *Id.* at 825.[32]

On December 3, 1990, the Supreme Court denied *certiorari.* *See Boston Ranch Co. v. Dep't of the Interior,* 498 U.S. 998, 998, 111 S.Ct. 555, 112 L.Ed.2d 562 (1990). The *res judicata* effect of the 1990 *Barcellos* appellate decision on the issues presented by this suit must be decided.

### L. *1991: The Government Moves for Entry of Judgment*

On July 30, 1991, the Government moved for entry of final judgment. *See* Doc. 127. It argued that the 1990 *Barcellos* appellate decision disposed of all issues in this lawsuit. *See id.* at 6–7. The water-users argued that the failure to provide drainage, an issue not decided by *Barcellos,* affects that calculus. *See* Doc. 141. On April 16, 1993, the motion for final judgment was denied, *see* Doc. 178, because two triable issues of fact were identified. First, were "appropriate issues relating to drainage." *Id.* at 15:16–24:

> [T]he drainage provided by the United States to the Westlands Water District has been greatly attacked. To the Court's knowledge, no case had considered the effect upon the respective rights and duties of the parties under the various agreements. Clearly, the cross-defendants and the third-party plaintiff cannot be precluded from raising appropriate issues relating to drainage in this litigation.

Second, were "any issues pertaining to the calculation of the sum owed to the United States, and the calculation of the interest to be paid them." *Id.* at 16:3–4.

"Drainage issues" were brought to the forefront in approximately June, 1986, when the United States ceased providing drainage to Westlands and the San Luis Unit. The San Luis Feasibility Report, prepared by the Secretary of the Interior in 1956, contemplated "a system of tile drains that would empty into an interceptor drain that would convey the water 197 miles to the Contra Costa Delta for disposal." *Firebaugh Canal Co.,* 203 F.3d at 571. Construction of part of this interceptor drain was initiated, and by 1975, the middle forty (40) percent of the drain, approximately 82 miles, was built. *See* Doc. 328 ¶ 14; Doc. 336 ¶ 14 (undisputed facts). In 1975, however, "the Secretary suspended construction of the interceptor drain, citing 'questions' and 'concerns' raised in the public arena." *Firebaugh Canal Co.,* 203 F.3d at 571.

Rather, a subsurface drainage collector system was constructed. *See id.* Drainage service utilizing this system commenced in 1978. *See id.* It operated until June, 1986, as follows:

> The subsurface collector drainage system discharged approximately 7,300 acre-feet annually of collected subsurface agricultural drainage into the portion of the drain constructed prior to 1975. The drain carried the drainage water to Kesterson Reservoir, which had become the temporary terminus of the drain.

*Id.* In mid–1983, however, "waterfowl nesting studies at Kesterson Reservoir revealed instances of embryo deformity and mortality." *Id.*

It was suspected that selenium in some of the soils in Westlands was being carried with drainage water into Kesterson Reservoir and was concentrating in bio-

---

**32.** *But see id.* at 830 ("at the time Congress added section 224(h) to the RRA, [the water users] had an existing contract right to receive water for their excess lands at the 1963 contract rate.") (Fernandez, J. dissenting).

ta. Like other metals, selenium can impair the growth of crops and is hazardous to human and animal life when present in high concentrations. *Id.* at 571–72. As a result, "[o]n March 15, 1985, the Secretary of the Interior announced that it would close the Reservoir." *Id.* at 572.

By June, 1986, "the drains at Westlands were plugged and the middle portion of the interceptor drain was closed." *Id.* The United States continued to deliver water to Westlands after June, 1986, but without providing drainage service.[33] Ultimately, the Government took the position that "subsequent changes in the law and environmental knowledge made compliance with the San Luis Act impossible, and thereby excused the United States from performing th[e] duty [to provide drainage]." *Id.* Affected landowners filed suit "seeking completion of the master drain to the Contra Costa Delta." *Id.* at 571. Two suits were filed, *Sumner Peck Ranch, Inc. v. Bureau of Reclamation*, No. CV–F–91–048, and *Firebaugh Canal Co. v. United States*, No. CV–F–88–634, which "were partially consolidated to resolve the plaintiffs' common allegation that the Secretary of Interior is required by law to construct facilities to drain agricultural drainage water from certain lands in Westlands Water District." *Id.* Such a statutory duty was found, as was breach of the duty to provide drainage. Judgment was entered for the landowners on these issues on March 12, 1995. *See Firebaugh Canal Co. v. United States*, No. CV–F–88–634 (E.D.Cal. Mar. 12, 1995) (Doc. 442).

The Government appealed, reiterating its arguments that it had no drainage obligation under the San Luis Act, or alternatively, if it did have such an obligation, the obligation had been excused by factual or legal impossibility.

### M. *1994: Released Funds*

On March 28, 1994, the Government moved to release all funds in the escrow account, except the funds claimed by claimants. *See* Doc. 216. All counsel agreed $1,733,201.00 could be released to the United States, *see* Doc. 236 at 6:9–11, and on December 7, 1994, the Government's motion was granted to the extent of the agreed sum, *see id.* at 6:13–14; 7:1–5.

### N. *1996: Cross-motions for Summary Judgment Re: Remaining Funds*

On August 23, 1996, the Government sought a final order to distribute the remainder of the escrow account funds to it. *See* Doc. 247. On August 26, 1996, the water-users filed a cross-motion for partial judgment on the pleadings, or, in the alternative, summary judgment against the United States. *See* Doc. 250. They advanced two theories: first, that the United States breached contracts with the water-users and Westlands. Specifically: Article 13 of their recordable contracts provides that the Secretary of Interior holds power of attorney over their excess lands for ten years after the recordable contracts were signed. This ten-year period is tolled when "water or 'service'" from the CVP was not available. The water-users contend that the term "service" includes ade-

---

**33.** This proved to be a improvident course of action, because an essentially impermeable clay layer underlies most of the western San Joaquin Valley (where Westlands is located), which means that the waste water that was not drained could not move downward through the soil to leach out the salts, causing a think layer of salt and selenium to rest on the surface of the farm land, which will continue to cause irreparable harm to the land. *See, e.g.,* RUTH PATRICK, EMILY FORD, & JOHN QUARLES, GROUNDWATER CONTAMINATION IN THE UNITED STATES 96 (1987); KENNETH D. FREDERICK & JAMES C. HANSON, WATER FOR WESTERN AGRICULTURE 190 (1982).

quate "drainage service," and that because little or no drainage service has ever been provided, the ten-year period has been tolled and never expired. They argue, if the ten-year period never expired, the original contract terms, including the $8.00 per acre-foot price, are still in effect, and section 224(h)[34] is inapplicable to water delivered to their excess lands under the extended recordable contracts.

Assuming, *arguendo,* that *Barcellos* makes section 224(h)[35] applicable to their contracts, the water-users contend the government's failure to provide drainage service breached the 1963 Contract and their recordable contracts, entitling them to damages. *See* Doc. 250 at 17:3–8. They anticipate the Government's assertion of the unmistakability and the sovereign acts defenses, preemptively arguing these defenses fail under *United States v. Winstar Corp.,* 518 U.S. 839, 116 S.Ct. 2432, 135 L.Ed.2d 964 (1996) (hereinafter *"Winstar"*).

Third, assuming, *arguendo,* that there was no breach of contract by the Government's failure to provide drainage service, the water-users assert a non-contractual theory of recovery: restitution of all drainage-related payments, because they paid for drainage, but never received it. *See id.* at 23.

O. *1997: Decision on cross-summary judgment motions*

A memorandum decision and order on these cross-motions issued April 3, 1997. *See* Doc. 278. As to the first argument, the term "'service' must include 'drainage service.'" *Id.* at 25:18–19. However, as *Barcellos* teaches: "It does not follow ... that Claimants had a right to subsidized water as long as they owned their excess land." *Id.* at 25:23–24. The water-users'

interpretation that the self-extended recordable contracts made RRA § 224(h)[36] inapplicable was "strained at best." *Id.* at 26:26. This April, 1997, memorandum decision held that RRA section 224(h) "does not abridge any contract right because Claimants have no absolute contract right to the unqualified delivery of water at the $8.00 rate." *Id.* at 27:10–12. Any *Winstar* analysis was found unnecessary, because "no enforceable contract right existed that § 224(h) could breach." *Id.* at 27:12–13. On the first two issues, summary judgment was granted against the water-users and for the Government, holding that section 224(h) did not wrongfully impair the water-users' contractual rights. *See id.* at 27:14–15. This holding was based on *Barcellos. See id.* at 24–27. For reasons stated below, reconsideration of these rulings is appropriate.

The Government did not address the water-users' non-contractual theory of recovery. *See id.* at 26:21. Finding that the *Firebaugh Canal Co.* appeal would impact the water-users' unjust enrichment theory, their cross-motion for summary judgment was denied without prejudice, pending the Ninth Circuit's decision in *Firebaugh Canal Co. See id.* at 27:22–28:20. The Ninth Circuit decided *Firebaugh Canal Co.* on February 04, 2000.

P. *2000: Firebaugh Canal Co. v. United States*

In *Firebaugh Canal Co.,* the Ninth Circuit rejected the Government's position that it need not provide drainage to the San Luis Unit contractors, *see Firebaugh,* 203 F.3d at 568:

Affected landowners, both inside and outside the San Luis Unit service area, sued the Department of the Interior,

---

**34.** 43 U.S.C. § 390ww(h) (2000).

**35.** *Id.*

**36.** 43 U.S.C. § 390ww(h) (2000).

seeking completion of the master drain to the Contra Costa Delta. *See Sumner Peck Ranch, Inc. v. Bureau of Reclamation,* 823 F.Supp. 715 [(E.D.Cal.1993)]; *Firebaugh Canal Co. v. United States,* No. CV–F–88–634.... In May of 1992, these lawsuits were partially consolidated to resolve the plaintiffs' mutual allegation that the Secretary of Interior is required by law to construct facilities to drain agricultural drainage water from certain lands in Westlands Water District.

*Id.* at 572. The United States appealed the entire district court judgment that, *inter alia:*

> require[d] the Department to "take such reasonable and necessary actions to promptly prepare, file and pursue an application for a discharge permit" with the California Water Resources Control Board, pursuant to the Government's duty to provide drainage under the San Luis Act.

*Id.* at 570 (quoting without citing the district court judgment). The Ninth Circuit affirmed the district court holding that: (1) the Government has a duty to provide drainage to the San Luis Unit; (2) performance of that duty has been unreasonably and unlawfully delayed; and (3) the time has now come to provide such drainage service. *See id.* at 575.[37]

### Q. 2000: Cross Motions Re: Remaining Funds

The current cross-summary judgment motions were filed July 3, 2000. *See* Docs. 324–28. "In light of the Ninth Circuit's recent *Firebaugh* decision" and "for other changes of circumstances," Doc. 324 at vii:14–18, the water-users seek reconsideration of the April 3, 1997, memorandum and order (Doc. 278), which held that they were required to pay the "full cost" rate as defined by RRA § 224(h). The water-users have two basic arguments: (1) they re-assert the contractual interpretation argument that the 1963 Contract's subsidized water rate applies to excess lands during Article 13 extension periods caused by the government's failure to provide drainage service; and (2) they are owed restitution for any drainage payments, because the government has not provided drainage.

The water-users support these arguments by claiming *Barcellos* is inapposite after *Winstar* and *Firebaugh.*[38] Their previously advanced *Winstar* argument was rejected in the 1997 memorandum decision, because "no enforceable contract right existed that § 224(h) could breach." Doc. 278 at 27:9–15. The water-users ar-

---

**37.** *Firebaugh* also held "the subsequent Congressional action has not eliminated the Department's duty to provide drainage, but that it has given the Department the authority *to pursue alternative options other than the interceptor drain* to satisfy its duty under the San Luis Act," *id.* at 577 (emphasis added):

> Although the district court can compel the Department of Interior to provide drainage service as mandated by the San Luis Act, the district court cannot eliminate agency discretion as to how it satisfies the drainage requirement. By ordering the Department of Interior to apply for a discharge permit, the district court precludes other, non interceptor-drain, solutions to the drainage duty created by the San Luis Act.

*Id.* at 578 (remanding to district court for implementation of, and compelling the Department to provide, drainage service).

**38.** In a letter dated October 23, 2000, the Boston Ranch Parties point to *General Dynamics Corp. v. United States,* 47 Fed. Cl. 514 (Fed.Cl.2000), writing "where a statute is not 'public and general,' the 'unmistakability doctrine' is not applicable." Presumably, their argument is that the unmistakability doctrine does not apply in this case, so it cannot insulate the Federal Defendants from the requirement to pay damages. *General Dynamics Corp.* may not affect the *Winstar* argument here, however, depending whether any breach of contract occurred regarding the price of water.

gue *Firebaugh* provides a factual basis to conclude that the recordable contracts may have been extended by failure to provide drainage service. *See* Doc. 324 at 13:14–19. The contract-extension argument is not new; its viability has been acknowledged. *See* Doc. 278 at 25:18–19 ("Claimants persuasively argue 'service' must include 'drainage service.' "). Nonetheless, even if recordable contracts are extended, the United States is not necessarily required to provide, in perpetuity, $8.00 per acre-foot water to landowner parties to the recordable contracts. *See id.* at 26:3–8 (citing *Barcellos,* 899 F.2d at 823). The water-users provide no new arguments, law, or facts as to the breach of contract issue raised regarding water-service prices.

However, no case has yet interpreted, outside of dictum, whether the 1963 Contract, the recordable contracts, and the 1986 *Barcellos* Judgment afford the water-users contract-priced (rather than full-cost) water for their excess lands during any time extended recordable contracts are effective if drainage service was not provided (which will be decided in the *Firebaugh Canal Co.* remand). This issue directly affects whether summary judgment should be granted.

Two other issues remain. First, the water-users argue they are entitled to restitution of the fees paid for drainage facilities and service under a theory of unjust enrichment, because the United States has not yet provided for such facilities and service. In addition, they argue they are entitled to interest on the interpled funds.

The United States rejoins that the water-users "are not entitled to any of the funds" because: (1) the Bureau has no discretion "other than to collect full cost;"

(2) based on *Orff,* no independent jurisdiction exists to hear the water-users' counterclaims; and (3) *Firebaugh Canal Co.* held the United States was not required to construct the interceptor drain under the San Luis Act, which "was the quid pro quo" for the water-users' drainage payments. *See* Doc. 327 at 2:3–14. The government's last argument addresses only part of the landowners' drainage claim. The landowners contend that even if "drainage" does not include the interceptor drain with East Bay terminus, they have not received "any drainage," *i.e.,* drainage service to which the Court of Appeals held they were entitled under the San Luis Act, which breaches their recordable contracts and the contract embodied within the 1986 *Barcellos* Judgment.

### R. *Types of Funds*

There are three different types of funds on deposit in this case:

(1) the fifty-cent drainage component from each $8.00 or "full cost" acre-foot payment since the 1986 *Barcellos* Judgment; [39]

(2) the difference between the $8.00 contract rate and the "full cost" rate paid for excess lands between 1986 and present; and

(3) any separate "drainage fund" payments.

### III. *LEGAL STANDARD*

### A. *Summary Judgment*

"Summary judgment 'shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to

---

**39.** Article 20 of the 1986 Judgment specifically precludes any reimbursement for the $0.50 drainage component paid prior to the Judgment: "No party or water user shall be entitled to reimbursement of any $0.50 per acre foot drainage service charged paid in the past."

any material fact and that the moving party is entitled to a judgment as a matter of law.'" *7–Up Bottling Co. of Jasper Inc. v. Varni Bros. Corp. (In re Citric Acid Litig.),* 191 F.3d 1090, 1093 (9th Cir.1999) (quoting FED. R. CIV. P. 56(c)). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *See Triton Energy Corp. v. Square D Co.,* 68 F.3d 1216, 1221 (9th Cir.1995); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party ·cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *See U.A. Local 343 v. Nor–Cal Plumbing, Inc.,* 48 F.3d 1465, 1471 (9th Cir.1994).

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

▄▄▄ The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *See United States ex rel. Anderson v. N. Telecom, Inc.,* 52 F.3d 810, 815 (9th Cir.1995); *see also Van Westrienen v. Americontinental Collection Corp.,* 94 F.Supp.2d 1087, 1094 (D.Or.2000) ("when the non-moving party's claims are factually implausible, that party must come forward with more persuasive evidence than would otherwise be required.") (citing *Cal. Architectural Bldg. Prods., Inc. v. Franciscan Ceramics Inc.,* 818 F.2d 1466, 1470 (9th Cir.1987)). Nevertheless, "the evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in its favor." *Murphy Exploration & Prod. Co. v. Oryx Energy Co.,* 101 F.3d 670, 673 (Fed.Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. 2505; *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)). A court's role on summary judgment, however, is not to weigh the evidence, *i.e.,* issue resolution, but rather to find genuine factual issues. *See Abdul–Jabbar v. Gen. Motors Corp.,* 85 F.3d 407, 410 (9th Cir. 1996).[40]

## B. *Reconsideration*

"[A] motion for reconsideration of summary judgment is appropriately brought under either Rule 59(e) or Rule 60(b)." *Fuller v. M.G. Jewelry,* 950 F.2d 1437,

---

**40.** Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under the standard articulated in 56(e). *See Keenan v. Hall,* 83 F.3d 1083, 1090 n. 1 (9th Cir.1996); *Anheuser-Busch, Inc. v. Nat'l Beverage Distribs.,* 69 F.3d 337, 345 n. 4 (9th Cir.1995). Properly authenticated documents, including discovery documents, although such documents are not admissible in that form at trial, can be used in a motion for summary judgment if appropriately authenticated by affidavit or declaration.

*See United States v. Lot 4, Block 5 of Eaton Acres,* 904 F.2d 487, 491–92 (9th Cir.1990). Supporting and opposing affidavits must be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein. *See* FED. R. CIV. P. 56(e); *Conner v. Sakai,* 15 F.3d 1463, 1470 (9th Cir.1993), *rev'd on other grounds sub nom., Sandin v. Conner,* 515 U.S. 472, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

1442 (9th Cir.1991) (citing *Taylor v. Knapp,* 871 F.2d 803, 805 (9th Cir.1989) (citing *Backlund v. Barnhart,* 778 F.2d 1386, 1388 (9th Cir.1985) (citing *Stephenson v. Calpine Conifers II, Ltd.,* 652 F.2d 808, 811 (9th Cir.1981)))). A 59(e) motion must be brought no later than ten (10) days following entry of the final judgment, *see* Fed.R.Civ.P. 59(e) (1992), whereas a 60(b) motion must be brought within a "reasonable" time, which cannot be more than one year if the motion is based on mistake ((b)(1)), newly-discovered evidence ((b)(2)), or fraud ((b)(3)), *see* Fed.R.Civ.P. 60(b)(1)-(b)(3) (1992). A Rule 59(e) motion for reconsideration that is filed outside the ten-day period may be interpreted as a Rule 60(b) motion. *Accord Taylor,* 871 F.2d at 805 (construing reconsideration motion labeled as Rule 60 motion as a Rule 59 motion, because it was filed eight days after entry of summary judgment, within the time period for Rule 59(e)).[41]

### 1. *Rule 59(e)*

▆▆▆ "A motion for reconsideration of summary judgment is appropriately brought under Rule 59(e)." *Backlund,* 778 F.2d at 1388 (citing *Stephenson,* 652 F.2d at 811). Rule 59(e) reconsideration is appropriate where: the district court is presented with newly-discovered evidence or committed clear error; the initial decision was manifestly unjust; or if there is an intervening change in controlling law. *See 389 Orange St. Partners v. Arnold,* 179 F.3d 656, 665 (9th Cir.1999) (citing *Sch. Dist. No. 1J, Multnomah County, Or. v. ACandS, Inc.,* 5 F.3d 1255, 1263 (9th Cir.1993) (hereinafter *"Sch. Dist. No. 1J"*) (citing *All Haw. Tours, Inc. v. Polynesian Cultural Ctr.,* 116 F.R.D. 645, 648 (D.Haw.

1987), *rev'd on other grounds,* 855 F.2d 860, 1988 WL 86203 (9th Cir.1988))). A reconsideration motion should not merely present arguments previously raised, or which could have been raised in the initial summary judgment motion. *See Backlund,* 778 F.2d at 1388 ("The motion was properly denied here because ... it presented no arguments that had not already been raised in opposition to summary judgment."); *United States v. Navarro,* 972 F.Supp. 1296, 1299 (E.D.Cal.1997) ("[M]otions to reconsider are not vehicles permitting the unsuccessful party to 're-hash' arguments previously presented.... Nor is a motion to reconsider justified on the basis of new evidence which could have been discovered prior to the court's ruling.... Finally, 'after thoughts' or 'shifting of ground' do not constitute an appropriate basis for reconsideration.") (citations omitted).[42] "These relatively restrictive standards 'reflect district courts' concern for preserving dwindling resources and promoting judicial efficiency.'" *Navarro,* 972 F.Supp. at 1299 (quoting *Costello v. United States Gov't,* 765 F.Supp. 1003, 1009 (C.D.Cal.1991)) (alteration omitted).

### 2. *Rule 60*

Rule 60(b) permits reconsideration of a district court order based on: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly-discovered evidence that supports grounds for a new trial under Rule 59; (3) fraud by an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged; or (6) any other reason justifying relief

---

**41.** A district court's denial of either motion is reviewed for an abuse of discretion. *See Fuller,* 950 F.2d at 1441.

**42.** The underlying decision on the merits, *United States v. Navarro,* 959 F.Supp. 1273

(E.D.Cal.1997), was reversed by *United States v. Navarro,* 160 F.3d 1254 (9th Cir.1998), *cert. denied,* 527 U.S. 1011, 119 S.Ct. 2354, 144 L.Ed.2d 249 (1999). This reversal did not affect the district court's denial of reconsideration.

from the operation of the judgment. *See* Fed.R.Civ.P. 60(b)(1)-(b)(6) (1992).[43]

■ Rule 60 reconsideration is generally appropriate in three instances: 1) when there has been an intervening change of controlling law, 2) new evidence has come to light, or 3) when necessary to correct a clear error or prevent manifest injustice. *Sch. Dist. No. 1J*, 5 F.3d at 1262; *see also* E.D. Cal. L.R. 78–230(k).[44] "A motion for reconsideration is not a vehicle to reargue the motion or to present evidence which should have been raised before." *Bermingham v. Sony Corp. of Am., Inc.*, 820 F.Supp. 834, 856 (D.N.J. 1992), *aff'd*, 37 F.3d 1485 (3d Cir.1994) (citing *Weyerhaeuser Corp. v. Koppers Co.*, 771 F.Supp. 1406, 1419 (D.Md.1991)). " 'A party seeking reconsideration must show more than a disagreement with the Court's decision, and "recapitulation of the cases and arguments considered by the court before rendering its original decision fails to carry the moving party's burden." ' " *Id.* at 856–57 (quoting *G–69 v. Degnan*, 748 F.Supp. 274, 275 (D.N.J.1990)) (quoting *Carteret Sav. Bank, F.A. v. Shushan*, 721 F.Supp. 705, 709 (D.N.J.1989)). To succeed, a party must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision. *See, e.g., Kern–Tulare Water Dist. v. City of Bakersfield*, 634 F.Supp. 656, 665 (E.D.Cal.1986), *aff'd in part and rev'd in part on other grounds*, 828 F.2d 514 (9th Cir.1987).[45]

**43.** "On motion and upon such terms as are just, the court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: (1) mistake, inadvertence, surprise, or excusable neglect; (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b); (3) fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party; (4) the judgment is void; (5) the judgment has been satisfied, released or discharged, or a prior judgment upon which it is based has been revered or otherwise vacated, or it is no longer equitable that the judgment should have prospective application; or (6) any other reason justifying relief from the operation of the judgment." Fed.R.Civ.P. 60(b) (1992).

**44.** Local Rule 78–230(k) permits reconsideration of:

any motion [that] has been granted or denied in whole or in part, ... [upon motion] setting forth the material facts and circumstances surrounding each motion for which reconsideration is sought, including:
(1) when and to what Judge or Magistrate Judge the prior motion was made,
(2) what ruling, decision or order was made thereon, and
(3) what new or different facts or circumstances are claimed to exist which did not exist or were not shown upon such prior motion, or what other grounds exist for the motion.
E.D. Cal. Civ. L.R. 78–230(k) (Aug. 1, 1997).

**45.** "Relief under Rule 60(b)(2) 'is an extraordinary remedy that is to be granted only in exceptional circumstances.' " *N. Ind. Gun & Outdoor Show, Inc. v. Hedman*, 111 F.Supp.2d 1020, 1026 (N.D.Ind.2000) (quoting *Provident Sav. Bank v. Popovich*, 71 F.3d 696, 698 (7th Cir.1995)). "The overwhelming weight of authority is that the failure to file documents in an original motion or opposition does not turn the late[-]filed documents into 'newly discovered evidence.' " *Sch. Dist. No. 1J*, 5 F.3d at 1263 (citing cases). In the Ninth Circuit, the party seeking reconsideration based on newly-discovered evidence must show the evidence: (1) is truly newly-discovered; (2) could not have been discovered through due diligence; and (3) is of such a material and controlling nature that it demands a probable change in the outcome. *See United States v. Tanoue*, 165 F.R.D. 96, 97 (D.Haw.1995) (citing *Coastal Transfer Co. v. Toyota Motor Sales, U.S.A.*, 833 F.2d 208 (9th Cir.1987)); *see also N. Ind. Gun & Outdoor Show, Inc.*, 111 F.Supp.2d at 1026 (requiring five similar factors: "(1) the evidence was discovered following trial; (2) due diligence on the part of the movant to discover the new evidence is shown or may be inferred; (3) the evidence is not merely cumulative or impeaching; (4) the evidence is material; and (5) the evidence is such that a new trial would

## IV. DISCUSSION

### A. Reconsideration

The water-users meet the requirements for reconsideration under Rule 60, because a clear error may have been made in, or a manifest injustice may occur as a result of, the 1997 memorandum decision's finding that *Barcellos* is dispositive of the contractual interpretation issues presented.

### B. Impact of the 1990 Barcellos[46] decision

Before a re-interpretation of the 1963 Contract, the Recordable Contracts, and the 1986 *Barcellos* Judgment can be performed, the extent to which the 1990 *Barcellos* appellate decision interprets their disputed provisions as an explicit holding (rather than dicta), which is law of the case, must be decided.

*Barcellos* definitively answers the "quite narrow," *Barcellos*, 899 F.2d at 823, question whether the 1963 Contract and/or recordable contracts gave the water-users the unqualified right to water at the $8.00 contract rate for their excess lands during any extended period of the recordable contracts (*i.e.*, beyond initial the 10–year

term) caused by their inability to sell those excess lands due to a federal district court injunction against such sales in effect from 1976 to 1982. It holds that the contracts do not afford the water-users an unlimited right to low-cost water service for excess lands during Article 13 ownership extension periods caused by the Bureau's failure to approve land sales, making it impossible to sell those excess lands, and accordingly, § 224(h) did not deprive them of anything. *See id.* at 823–25. This conclusion is based on a rejection of the water-users' argument that Article 13 of the recordable contracts, which tolls the ten-year period during times when "water or service" was not provided, included the "service" of approving excess land sales.[47] *See id.* at 823. The basis for this holding was that approving land sales was neither "water" nor "service" within the intended meaning of Article 13. *See id.*

The 1997 memorandum decision interpreted the *Barcellos* appellate decision to find that regardless of the intended meaning of the term "service" in Article 13, the water-users had no contract right to subsidized water during any period of "extended" (more than 10 years') ownership of their excess lands,[48] in view of the *Barcel-*

---

probably produce a new result.") (citing *In re Chicago, Milwaukee, St. Paul & Pac. R.R. Co.*, 78 F.3d 285, 293–94 (7th Cir.1996)).

**46.** *Barcellos*, 899 F.2d at 814.

**47.** *I.e.*, if "water or service" in Article 13 did not encompass approving land sales, then Article 13 did not give the water-users a right to extend the 10 years of ownership and subsidized water. If the ten years of ownership and subsidized water was not extended by the recordable contracts perforce, then § 244(h)'s increase in the acre-foot rate did not infringe any protected contractual right.

**48.** *Barcellos* contains a few statements that, if read out of context, appear to hold that the 1963 Contract provides for only ten (10) years of subsidized water for excess lands:

(1) Article 13, when properly construed, perhaps at most implicitly provides for the

converse relationship between extended ownership and extended water rights. If a landowner were actually to suffer from a cut off of *water* through no fault of his own, it is arguable that he would be entitled to hold onto his lands for a long enough time to receive the benefit that Article 13 seems intended to confer, *id.* at 823–34;

(2) We have found no provision in either the District Contract or the recordable contracts that provides that the right to receive water on excess lands for more than ten years follows from the right to own them for more than ten years, *id.* at 824;

(3) Although we hold that the District contract and the [water-users'] recordable contracts did not give them any *contractual right* to receive more than ten years of subsidized water . . . ., *id.* at 825; and

(4) In sum, since we find that the appellants never had a contractual right to re-

*los'* finding that section 224(h) applied to the 1963 Contract and the 1986 Judgment. *See, e.g., id.* at 823–25. Upon closer scrutiny, this finding was not on an issue necessary to the Circuit Court's decision, because once the Court found that "service" did not include approving land sales, the case was over: there was no contract provision to authorize an Article 13 extension.

■ *Barcellos* is factually distinguishable, because the only extending event at issue was Interior's non-approval of excess land sales during 1976 until 1984. The event of an express Article 13 extending cause, absence of drainage "service," was not at issue. Because "land sale approval" was not encompassed by the Article 13 terms, "water or service," the gratuitous discussion in *Barcellos* regarding the right to subsidized water during extension periods was not necessary to the decision; it is dicta. *See Trent v. Valley Elec. Ass'n, Inc.*, 195 F.3d 534, 537 (9th Cir.1999) (interpreting prior panel's statement as dicta and therefore not binding under the law of the case doctrine) (citing *Milgard Tempering, Inc. v. Selas Corp. of Am.*, 902 F.2d 703, 715 (9th Cir.1990)); *Export Group v. Reef Indus., Inc.*, 54 F.3d 1466, 1472 (9th Cir.1995) (rejecting statements not necessary to another decision as dicta and declining to follow as binding precedent);

*Sarnoff v. Am. Home Prods. Corp.*, 798 F.2d 1075, 1084 (7th Cir.1986) ("A dictum is a statement in a judicial opinion that could have been deleted without seriously impairing the analytical foundations of the holding—that, being peripheral, may not have received the full and careful consideration of the court that uttered it.") (Posner, J.); *see also OXY USA, Inc. v. Babbitt*, 230 F.3d 1178, 1184 (10th Cir.2000) ("dicta are 'statements and comments in an opinion concerning some rule of law or legal proposition not necessarily involved nor essential to determination of the case in hand.'") (quoting *Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1184 (10th Cir.1995) (quoting BLACK'S LAW DICTIONARY 454 (6th ed.1990))); *United States v. Wade*, 152 F.3d 969, 973 (D.C.Cir.1998) ("Because that issue was not before the court, its overly broad language would be *obiter dicta* and not entitled to deference.") (citing cases); *Nephew v. City of Aurora*, 766 F.2d 1464, 1466 (10th Cir.1985) (rejecting dicta from prior panel, although facially on point); BLACK'S LAW DICTIONARY 465 (7th ed.1999) (defining judicial dictum as "[a]n opinion by a court on a question that is directly involved, briefed, and argued by counsel, and even passed on by the court, but that is *not essential* to the decision.") (emphasis added).[49] Dicta are not binding as law of the case. *See, e.g., Trent*, 195 F.3d at 537.[50]

ceive more than ten years of water for their excess lands, Congress, in enacting § 224(h), did not deprive them of a property right within the meaning of the fifth amendment, *id.*

Each of these passages must be considered as it bears on the specific issue before the Appeals Court: did the term "water or service" in Article 13 of the recordable contracts encompass the "service" of approving land sales? In finding no basis to treat land-sales approval as "water or service," no contractual right to an Article 13 extension existed, so § 224(h) did not abridge any contractual right.

**49.** *But see Levander v. Prober (In re Levander)*, 180 F.3d 1114, 1123 (9th Cir.1999) ("When

an appellate court has alternative bases for its holding, it cannot be claimed that all but one of the bases is unnecessary dicta. Part III of the Court's opinion here is not irrelevant to our disposition of the matter, as the special concurrence claims; rather, it is an alternative holding providing one of two independent bases for supporting our disposition.") (Ferguson, J., concurring) (citing *United States Steel Corp. v. United States E.P.A.*, 444 U.S. 1035, 1038, 100 S.Ct. 710, 62 L.Ed.2d 672 (1980) (Rehnquist, J., dissenting from denial of certiorari) (recognizing that alternative holdings are not dicta)).

**50.** Under the doctrine of res judicata, a prior adjudication may have two distinct types of preclusive effects: claim preclusion and issue

*Barcellos* did not address the different issue raised here: the effect of an absence of drainage service on the full-cost provision and the Article 13 extension period. In *Barcellos*, the water-users argued that the combination of the 1963 Contract and recordable contracts entitled them to subsidized water for their excess lands during any time they own these lands ("extended period") after the initial ten-year period of subsidized water lapsed.[51] Unlike *Barcellos*, the term "service" under Article 13 encompasses drainage service, which the water-users claim was not provided in any of the years in question, with the alleged effect that the ten-year period of subsidized water and ownership is indefinitely extended until such time drainage service is provided.[52]

The *Barcellos* pronouncement that there was no possibility that a right to subsidized water existed during any Article 13 extension periods, for more than 10 years, is dicta. It is not binding as law of the case. Careful re-analysis of *Barcellos* leads to the conclusion that it does not decide the issues presented here. The entire 1963 Contract was not interpreted by the *Barcellos* majority. Further interpretation of the 1963 Contract by another

panel in *O'Neill* shows that extrinsic evidence may be relevant. *See O'Neill*, 50 F.3d at 682.

## C. *Contractual Interpretation*

### 1. *Contractual Interpretation: Basic Principles*

When interpreting a contract, the plain language within the four corners of the contract must first be examined to determine the mutual intent of the contracting parties. *See, e.g., United States v. Clark*, 218 F.3d 1092, 1096 (9th Cir.2000) ("Following traditional rules of contract interpretation, we must examine the plain language of the term in the context of the document as a whole.") (quoting sources). In "cases of contracts, language is to be given, if possible, its usual and ordinary meaning. The object is to find out from the words used what the parties intended to do." *Fla. Cent. R.R. Co. v. Schutte*, 103 U.S. (Mem.) 118, 140, 13 Otto 118, 26 L.Ed. 327 (1880). "Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs." *Giove v. Dep't of Transp.*, 230 F.3d 1333, 1340–41 (Fed.Cir.2000) (quoting *N. German Lloyd v. Guar. Trust Co.*, 244 U.S. 12, 24, 37

preclusion. The Ninth Circuit and the United States Supreme Court have both noted a preference for the term "claim preclusion" instead of "merger," "bar," or "res judicata," and for the term "issue preclusion" instead of "collateral estoppel." *See Migra v. Warren City Sch. Dist. Bd. of Educ.* 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984); *Robi v. Five Platters*, 838 F.2d 318, 321 & n. 2 (9th Cir.1988); *Americana Fabrics v. L & L Textiles*, 754 F.2d 1524, 1529 (9th Cir.1985). In a federal cause of action, "[c]laim preclusion 'prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" *Robi*, 838 F.2d at 322 (quoting *Brown v. Felsen*, 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979)). Issue preclusion "prevents relitigation of all 'issues of fact

or law that were actually litigated and necessarily decided' in a prior proceeding." *Id.* (quoting *Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir.1979)).

**51.** *E.g.*, in *Barcellos*, the water-users argued that because they were prevented by injunction from selling their lands during its term, that period tolled the ten-years' deadline to divest themselves of their lands, and they were entitled to continue to receive low-cost water until that ten years expired; an interpretation that the Ninth Circuit rejected.

**52.** There can be no argument for Article 13 extension if water and drainage service were provided to excess lands for ten years following execution of any recordable contract. This issue has been decided by *Barcellos*.

S.Ct. 490, 61 L.Ed. 960 (1917); *Deloro Smelting & Ref. Co. v. United States*, 161 Ct.Cl. 489, 317 F.2d 382, 387 (1963) (quoting *N. German Lloyd*, 244 U.S. at 24, 37 S.Ct. 490)) (alteration marks and internal quotation marks omitted).

"A written contract must be read as a whole and every part interpreted with reference to the whole, with preference given to reasonable interpretations." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1210 (9th Cir.), *cert. denied*, —— U.S. ——, 121 S.Ct. 44, 148 L.Ed.2d 14 (2000) (citing *Kennewick Irrigation Dist. v. United States*, 880 F.2d 1018, 1032 (9th Cir.1989)). "The normal rule of construction, of course, is that courts must interpret contracts, if possible, so as to avoid internal conflict." *Trident Ctr. v. Conn. Gen. Life Ins. Co.*, 847 F.2d 564, 566 (9th Cir.1988) (citing sources). "The interpretation of a contract is a mixed question of law and fact." *Tyler v. Cuomo*, 236 F.3d 1124, 1134 (9th Cir.2000) (quoting *Klamath Water Users Protective Ass'n*, 204 F.3d at 1210 (citing *O'Neill*, 50 F.3d at 682 (citing *Carpenters Pension Trust Fund v. Underground Constr. Co.*, 31 F.3d 776, 778 (9th Cir.1994)))).

"A contract is ambiguous if reasonable people could find its terms susceptible to more than one interpretation. The fact that the parties dispute a contract's meaning does not establish that the contract is ambiguous." *Barcellos & Wolfsen, Inc.*, 849 F.Supp. at 721 (quoting *Kennewick Irrigation Dist.*, 880 F.2d at 1032 (quoting *Int'l Union of Bricklayers & Allied Craftsman Local No. 20 v. Martin Jaska, Inc.*, 752 F.2d 1401, 1406 (9th Cir.1985))) (internal citation and citation marks omitted). "[T]he determination whether contract language is ambiguous is a question of law." *Tyler*, 236 F.3d at 1134 (quoting *Klamath Water Users Protective Ass'n*, 204 F.3d at 1210 (citing *O'Neill*, 50 F.3d at 682 (citing *Carpenters Pension Trust Fund*, 31 F.3d at 778))).

■■■ Federal common law controls contractual interpretation if the United States is a party to the contract and entered into it pursuant to federal law. *See Klamath Water Users Protective Ass'n*, 204 F.3d at 1210 (citing *O'Neill*, 50 F.3d at 682).[53] "In fashioning federal rules, guidance is gained from general principles for interpreting contracts." *Saavedra v. Donovan*, 700 F.2d 496, 498 (9th Cir.1983) (citing *United States v. Seckinger*, 397 U.S. 203, 209–11, 90 S.Ct. 880, 25 L.Ed.2d 224 (1970)).

■■■ Although "[u]nder the parol evidence rule, a court looks to, and enforces, the plain language of a contract and does not look to 'extrinsic evidence to interpret the terms of an unambiguous written instrument,'" *United States v. Nunez*, 223 F.3d 956, 958 (9th Cir.2000) (quoting *Wilson Arlington Co. v. Prudential Ins. Co. of Am.*, 912 F.2d 366, 370 (9th Cir.1990) (citing *Trident Ctr.*, 847 F.2d at 568–69)) (ellipses omitted),[54] because the Uniform

---

**53.** Sources of federal common law include: (1) the Restatement of Contracts (2d); (2) the U.C.C.; (3) federal caselaw; and (4) state law. *See* Robert E. Jones, Gerald E. Rosen, William E. Wegner, and Jeffrey Scott, *Federal Civil Trials and Evidence* ¶ 8:4455 (2000) (citing cases).

**54.** "The basis for the rule that 'extrinsic evidence is inadmissible to interpret, vary or add to the terms of an unambiguous written instrument' is that

if parties to an agreement could not rely on written words to express their consent to the express terms of that agreement, those words would become little more than sideshows in a circus of self-serving declarations as to what the parties to the agreement really had in mind. The parole evidence rule thus enables parties to rely on written instruments as embodying a complete memorial of their agreement, and to avoid costly and disruptive litigation over the existence of oral and implied terms

Commercial Code ("U.C.C.") is another source of federal common law upon which a district court may rely when interpreting a contract where the federal government is a party,[55] "[t]he Code permits the [Court to] use . . . extrinsic evidence in a manner that substantially narrows the traditional application of the parole evidence rule." *O'Neill,* 50 F.3d at 684. For example, under U.C.C. § 2–202(a), evidence of prior dealings, usage, and performance is also relevant in determining whether the contract is ambiguous. *See* U.C.C. § 2–202(a);[56] *see also Trident Ctr.,* 847 F.2d at 569 (noting that under California law, "it matters not how clearly a contract is written, nor how completely it is integrated, nor how carefully it is negotiated, nor how squarely it addresses the issue before the court: the contract cannot be rendered impervious to attack by parol evidence. If one side is willing to claim that the parties intended one thing but the agreement pro-

vides for another, the court must consider extrinsic evidence of possible ambiguity.") (discussing *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968)) (Kozinski, J.). However, if a contractual term is ambiguous, extrinsic evidence may be utilized to interpret the "parties' intent in light of earlier negotiations, later conduct, related agreements, and industry-wide custom." *Pace v. Honolulu Disposal Serv., Inc.,* 227 F.3d 1150, 1158 (9th Cir. 2000) (quoting *Pierce County Hotel Employees & Rest. Employees Health Trust v. Elks Lodge,* 827 F.2d 1324, 1327 (9th Cir. 1987)) (internal quotation marks and ellipsis omitted).[57]

The U.C.C. specifically differentiates between a usage of trade; a course of dealing; and a course of performance. A usage of trade is:

any practice or method of dealing having such regularity of observance in a place,

---

that may or may not have been contemplated by the parties."
*Barcellos & Wolfsen, Inc.,* 849 F.Supp. at 721 (quoting *Wilson Arlington Co.,* 912 F.2d at 370 (citing *Admiral Builders Sav. & Loan Assoc. v. S. River Landing, Inc.,* 66 Md.App. 124, 502 A.2d 1096, 1098–100 (1986); *Darner Motor Sales, Inc. v. Universal Underwriters Ins. Co.,* 140 Ariz. 383, 682 P.2d 388, 398–99 (1984); *Bryan v. Vaughn,* 579 S.W.2d 177, 181–82 (Mo.App.1979); *Pac. Gas & Elec. Co. v. G.W. Thomas Drayage & Rigging Co.,* 69 Cal.2d 33, 69 Cal.Rptr. 561, 442 P.2d 641 (1968); *Amos v. Coffey,* 228 Va. 88, 320 S.E.2d 335 (1984))) (alteration marks omitted).

**55.** *See Cent. Ariz. Water Conservation Dist. v. United States,* 32 F.Supp.2d 1117, 1127 (D.Ariz.1998) (citing *O'Neill,* 50 F.3d at 684 (citing *Clem Perrin Marine Towing, Inc. v. Panama Canal Co.,* 730 F.2d 186, 189 (5th Cir.1984))).

**56.** U.C.C. § 2–202 provides:
Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression

of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
(a) by course of dealing or usage of trade (Section 1–205) or by course of performance (Section 2–208); and
(b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement.

**57.** *See also, e.g., United States ex rel. Lindenthal v. Gen. Dynamics Corp.,* 61 F.3d 1402, 1411 (9th Cir.1995) ("We agree that extrinsic evidence was properly admitted to flesh out the meaning [of the contract]. 'Where contractual language is unclear and suggests several speculative interpretations, the scope of the language must be read in accordance with the parties' contemporaneous construction, and extrinsic evidence is admissible to show what the parties intended it to mean.' ") (quoting *Lockheed Aircraft Corp. v. United States,* 213 Ct.Cl. 395, 553 F.2d 69, 89 (1977)) (ellipses omitted).

vocation or trade as to justify an expectation that it will be observed with respect to the transaction in question. The existence and scope of such a usage are to be proved as facts.

U.C.C. § 1–205(2). A course of dealing is: a sequence of previous conduct between the parties to a particular transaction which is fairly to be regarded as establishing a common basis of understanding for interpreting their expressions and other conduct.

*Id.* at (1).

Where the contract for sale involves repeated occasions for performance by either party with knowledge of the nature of the performance and opportunity for objection to it by the other, any course of performance accepted or acquiesced in without objection shall be relevant to determine the meaning of the agreement.

*Id.* at § 2–208.

■ If an ambiguity persists in the contract after resort to extrinsic evidence, the doctrine of *contra proferentem* [58] must be applied, which construes any ambiguity in the contract against the drafter. *See, e.g., Vizcaino v. Microsoft Corp.,* 97 F.3d 1187, 1194 (9th Cir.1996) (citing *Barnes v. Indep. Auto. Dealers Ass'n of Cal. Health & Welfare Benefit Plan,* 64 F.3d 1389, 1393 (9th Cir.1995) ("We must construe ambiguities in an ERISA plan against the

drafter and in favor of the insured.") (citing *Mongeluzo v. Baxter Travenol Long Term Disability Benefit Plan,* 46 F.3d 938, 942 (9th Cir.1995)); *Babikian v. Paul Revere Life Ins. Co.,* 63 F.3d 837, 840 (9th Cir.1995); *Mongeluzo,* 46 F.3d at 942 (noting that *Kunin v. Benefit Trust Life Ins. Co.,* 910 F.2d 534, 539–41 (9th Cir.1990), adopted the well-established doctrine of *contra proferentem* as federal common law)).[59]

■ Last, if no other method can adequately interpret the contractual provision in question, the court allocates the risk of the unforeseeable loss to the more efficient risk bearer. *See, e.g.,* ROBERT COOTER & THOMAS ULEN, LAW & ECONOMICS 200–03 (3d ed.2000); Ian Ayers & Robert Gertner, *Filling Gaps in Incomplete Contracts: An Economic Theory of Default Rules,* 99 YALE L.J. 87 (1989).

■ Contractual interpretation principles apply to the 1963 Contract, the recordable contracts, and the 1986 Judgment, because a federal court consent judgment "is a negotiated agreement that is entered as a judgment of the court, . . . has attributes of both contracts and judicial decrees," *Bragg v. Robertson,* 83 F.Supp.2d 713, 717 (S.D.W.Va.2000) (citations omitted),[60] and is interpreted according to federal contract law, *see, e.g., United States v. Gila Valley Irrigation Dist.,* 31 F.3d 1428, 1433 (9th Cir.1994) ("consent decrees

---

**58.** "[T]he maxim *omnia praesumuntur contra proferentem* . . . favor[s] that meaning which least benefits the drafter, if it finds one or more provisions are subject to multiple reasonable meanings." *Sharpe v. W. Indian Co., Ltd.,* 118 F.Supp.2d 646, 650 n. 4 (D.V.I. 2000) (alterations added).

**59.** *See, e.g., Indep. Petroleum Ass'n of Am. v. Armstrong,* 91 F.Supp.2d 117, 124 (D.D.C. 2000) ("A court interpreting the terms of a government contract must examine its express terms. Thus, unlike the more solicitous standards of review under the Administrative

Procedures Act, if the terms of a government contract are ambiguous, under the *contra proferentem* doctrine, courts will interpret them against the government as the drafter of the contract. Indeed, no deference is due an agency's interpretation of contracts in which it has a proprietary interest.") (internal citation omitted) (quoting cases).

**60.** *See also Gilmore v. California,* 220 F.3d 987, 1000 & n. 17 (9th Cir.2000) ("In its ordinary usage, a consent decree is both a contract of settlement and a final judgment.") (citing many cases).

'should be construed basically as contracts.'") (quoting *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 236–37, 95 S.Ct. 926, 43 L.Ed.2d 148 (1975)); *Hook v. Ariz., Dep't of Corrs.*, 972 F.2d 1012, 1014 (9th Cir.1992) ("[C]onsent decrees are essentially contractual agreements that are given the status of a judicial decree. Contract principles are generally applicable in our analysis of consent decrees, provided contract analysis does not undermine the judicial character of the decree.") (citing *Thompson v. Enomoto*, 915 F.2d 1383, 1388 (9th Cir.1990)).

### 2. *Express Language Analysis*

a. *Article 13 "Service" includes drainage service*

Do the Article 13 extension period provisions from the recordable contracts apply to lack of drainage service? The "Definitions" section of the 1963 Contract does not explicitly define "service." The "Explanatory Recitals" expressly state that Westlands contracts with the government to furnish the landowners with "a supplemental water supply from the Project *and for drainage service.*" 1963 Contract, at 13–16 (emphasis added). "[T]hroughout the documents defining the relationship among the landowners, the District, and Interior, 'service' appears in contexts where it clearly refers to the service of distributing water and *providing drainage facilities to recipients.*" *Barcellos*, 899 F.2d at 823 n. 14 (emphasis added).

The price per acre-foot of water provision in Article 6(a) of the 1963 Contract confirms that "water or service" in Article 13 of the recordable contracts includes drainage service, because those two items were the predominant benefit of the bargain: $7.50/acre-foot for water, and $0.50/acre-foot for drainage. By unambiguous terms within the 1963 Contract, a failure to provide drainage service implicates the Article 13 extension provision of the recordable contracts.

b. *1963 Contract*

Westlands and the government entered into the 1963 Contract on June 5, 1963, for the express purpose that the government provide CVP water to lands within Westlands' boundaries for a forty-year term. *See* 1963 Contract ¶ 2. Article 3 separates the amount of water to be provided into three periods:

(1) years 1–5;

(2) years 6–15;

(3) years 16–40.

In each such period, the total volume of water that the United States must provide is reduced from the previous period, with the government's performance obligation described as:

> the United States shall furnish to the District, and the District each such year shall accept and pay, *as provided in Article 6 hereof,* for water from the San Luis Unit in the quantities specified in the schedule . . . .

1963 Contract ¶ 3(a) (emphasis added). The 1963 Contract does not differentiate between excess and non-excess lands for the per acre-foot water price.

Only one contractual term explicitly sets the acre-foot [61] price for water. Article 6(a) of the 1963 Contract provides that the annually-announced contract rate for water "may not be in excess of Eight Dollars ($8) per acre-foot and shall include a drainage service component of not to exceed

---

**61.** An acre-foot is a "volume measurement in irrigation equal to the amount of water that will cover one acre of land in one foot of water." BLACK'S LAW DICTIONARY 24 (7th ed.1999). It is equivalent to 325,851 gallons of water, *see, e.g., Water Science Glossary of Terms, at* http://wwwga.usgs.gov/edu/dictionary.html (last visited Feb. 19, 2001) (no modification date given), which is 43,560 ft3.

Fifty Cents ($0.50) . . . and a water service component of not to exceed Seven Dollars and Fifty Cents ($7.50)."

In describing how Westlands will annually pay for water, *e.g.*, half before January 1st, Article 6(b) specifically references paragraph 6(a) for the rate: "[t]he District shall make payments to the United States each year *at the rate fixed as provided in subdivision (a) of this article.*" 1963 Contract ¶ 6(b) (emphasis added). Article 5 limits Westlands' water delivery to lands within the District without prior written consent.

Article 23(a) prevents Westlands from delivering water to any excess lands [62] "unless the owners thereof shall have executed valid recordable contracts in form prescribed by the United States." In Article 25(b)(i), as a "further condition precedent to the right to receive water made available pursuant to [the 1963] contract for any of his excess land," each water-user in these recordable contracts:

agree[d] to dispose of his excess land . . . to persons who can take title thereto as nonexcess land . . . within a period of ten (10) years after the date of the execution of said recordable contract and agree[d] further that if said land is not so disposed of within said period of ten (10) years, the Secretary shall have the power to dispose of said land at the appraised value thereof fixed . . . on behalf of such large landowner . . . .

"Each [water-user] entered into at least one such recordable contract with Interior

between 1969 and 1974." *Barcellos*, 899 F.2d at 816.

The 1963 Contract provides Westlands with water service for a specific annual volume at a $7.50/acre-foot water price and $0.50/acre-foot for drainage service. The Contract contains substantial detail about the maximum volume of water to be delivered in any year, and any reductions for water available from the Corcoran clay. *See* 1963 Contract ¶¶ 3(a)-(e). Only Article 6(a) enumerates the price for each acre-foot of water. Article 15 provides: "the payment of charges at the rate and upon the terms and conditions provided for herein is a prerequisite to the right to the use of water furnished to the District pursuant to this contract."

### c. Recordable Contract(s)

The prefatory recitals of the recordable contracts highlight that the landowners agreed to divest themselves of their excess lands "as an inducement to the United States to make water and distribution facilities available to the District for the excess land of the Landowner." [63] Under Article 5, "[a]ll rights of the Landowner to receive Project water for its excess land shall be subject to the provisions of the [1963] District Contract and this contract." Article 8 of the recordable contracts limits the provision of water and service to excess lands under the terms of the 1963 Contract to times when the landowner owns the land, or sells it to a qualified "nonexcess landowner." [64]

---

**62.** Section 25(a) of the 1963 Contract defines "excess land" as lands in excess of 160 acres for a single person or 320 acres for a husband and wife jointly owning the land.

**63.** Pages 2–3.

**64.** Article 8 of the recordable contract reads in its entirety:

None of the excess land described in article 2 hereof shall be entitled to receive water nor shall service be made available to such

land pursuant to the [1963] Contract, except while owned by the Landowner, unless the same shall have been sold to a person who, as the owner of such land, is qualified as a nonexcess landowner to receive Project water under the provisions of the Federal reclamation laws, the District Contract, and this agreement in full compliance with the provisions thereof.

Article 11 of the recordable contracts mirrors the 1963 Contract's ten-year divestiture provisions:

> The landowner hereby irrevocably makes, constitutes, and appoints the Secretary of the Interior, United States Department of the Interior, its true and lawful attorney for it in his name, place, and stead, to sell and transfer at any time following the expiration of a period of ten (10) years immediately following the date of execution of this agreement, all of its right, title, and interest in and to any or all of the excess land described in article 2 . . . .

Article 13 of these recordable contracts reads:

> . . . the computation of the ten-year period prescribed in article 11 hereof shall not include any year or years in which *water or service* from the Project may not be available to the land involved through no fault of the District or the Landowner.

### 3. *Extrinsic Evidence: Course of Performance*

The *Barcellos* opinion's contractual interpretation must be reconsidered in light of the Ninth Circuit's later interpretation of the 1963 Contract. Under federal common law, which includes the Uniform Commercial Code in *O'Neill*, 50 F.3d at 684 (citing *Clem Perrin Marine Towing, Inc.*, 730 F.2d at 189 ("The Uniform Commercial Code is a source of federal common law")), the contracting parties' course of performance and dealing may be consulted to determine whether a contractual term is ambiguous, *see id.* (citing U.C.C. § 2–202). *O'Neill* found that the issue of interpretation of water-shortage provisions of the 1963 Contract, in light of Westlands' con-

tention that prorata allocation among all CVP contractors was required, could not be decided as a matter of law without remand for the taking of evidence. However, "[i]n no event may extrinsic evidence be employed to contradict explicit contract language or to drain an agreement's text of all content save ink and paper." *Smart v. Gillette Co. Long–Term Disability Plan*, 70 F.3d 173, 180 (1st Cir.1995) (citing *Burnham v. Guardian Life Ins. Co. of Am.*, 873 F.2d 486, 489 (1st Cir.1989) (admonishing that "courts have no right to torture language in an attempt to force particular results or to convey delitescent nuances the contracting parties neither intended nor imagined.")).

The *Barcellos* majority recognized the propriety of interpreting the 1963 Contract as a whole, *see Barcellos*, 899 F.2d at 821–25 (discussing different Articles of the 1963 Contract), but did not do so completely. The course of performance by the contracting parties, Interior and Westlands, aids interpretation of the 1963 Contract's pricing term.

#### a. *December, 1983: Interior Final Rule 11(i)(4)*

"Land under recordable contract which is held by a water user not subject to the discretionary provisions may continue to receive irrigation water at the contract rate for the extended term of the contract . . . ." 1983 WL 110969 (48 Fed.Reg. 54,-748; at 54,781 (Dec. 5, 1983)).[65] Under this rule, for any extended term of a recordable contract, such excess land was eligible during the extended term to receive subsidized water. Even after the 1986 *Barcellos* Judgment, Interior retained Rule 11(i)(4) until 1987. *See* 1987 WL 129697 (52 Fed.Reg. 11,938; at 11,973 (Apr. 13, 1987)).[66]

---

**65.** Former 43 C.F.R. § 426.11(i)(4).

**66.** "Land under recordable contract which is held by a water user not subject to the discre-

tionary provisions may continue to receive irrigation water at the contractual rate for the extended term of the contract."

b. *December, 1986: Barcellos Consent Judgment*

By paragraphs 8–9,[67] the 1986 Consent Judgment refunded all water payments in excess of the $8.00/acre-foot contract rate made since June 30, 1978, the date of the Krulitz opinion, *including payments for water used on excess lands. See also Barcellos,* 899 F.2d at 819. Under the 1982 RRA, the government was not otherwise required to so do, because § 205(c) explicitly limited the right to receive subsidized water to ten years, regardless whether Article 13 extended the ten-years' divestiture requirement. *But see* RRA § 203(b), 43 U.S.C. § 390cc(b) (2000) (omitting § 205(c) from list of RRA sections specifically applicable to recordable contracts executed prior to RRA's effective date). In 1982, Congress, by RRA § 209(d), superseded the district court injunction against selling excess lands. Shortly after that time, excess land sales resumed, so Article 13 of the recordable contracts (if applicable) could no longer extend the ten-years' ownership based on Interior's failure to approve land sales. From 1982 (the RRA's effective date) to 1986, the landowners still had extended time left on their ownership of the excess lands,[68] but under RRA § 205(c), after eighteen months, they should no longer have received subsidized water.[69] But they did.

The Senate apparently understood that the 1986 *Barcellos* Consent Judgment allowed water to continue to be delivered to excess lands at the $8.00/acre-foot rate for the "extended duration of the contract." *See, e.g.,* 132 Cong. Rec. S16575–01 (daily ed. Oct. 17, 1986) (statement of Sen. Proxmire) ("Under the [1986 *Barcellos* Consent Judgment] Westlands could violate the [1982 RRA limitation of subsidized water to only non-excess lands] for an additional 20 years."); 132 Cong. Rec. E2762–01 (extension of remarks, Aug. 6, 1986) (Rep. Tony Coelho) ("[Under the 1986 *Barcellos* Consent Judgment] [t]he United States would agree to perform the water service contract that it has had with Westlands since 1963, a contract whose validity has not been challenged. This contract has been approved by the President, by Congress, and by the Court. This contract requires the United States to deliver 900,000 acre-feet of firm water supply at a rate of $7.50 per acre-foot plus the additional drainage service change [sic] of 50 cents per acre-foot."); 132 Cong. Rec. E2711–01 (extension of remarks, Aug. 1, 1986) (Hon. Howard Wolpe) ("In direct violation of the 1982 Reclamation Reform Act, [the 1986 *Barcellos* Consent] settlement entitles a group of wealthy Westland agricultural interests to *expanded* water rights at a fraction of their actual cost.... The settlement not only releases Westlands from responsibility for [the Kesterson Wildlife Refuge] problem, but in fact encourages further such problems by *increasing* the amount of cheap water avail-

67. Pages 32–36,

68. The Boston Ranch Parties executed their recordable contracts in 1972. Under Section 205(c), their right to subsidized water expired in 1982, with the 18–month extension from when land sales were resumed, which also was in 1982 (under § 205(d)). There was a period from mid–1983 to 1986, 2.5 years, that the Boston Ranch Parties received subsidized water that § 205(c) said they should not receive. Nevertheless, the 1986 *Barcellos* Judgment refunded to them any "full cost" amounts they paid for their excess lands before 1986 and prevented recovery of any amounts over the contract rate through the date of the 1986 *Barcellos* Judgment. *See* 1986 Judgment ¶ 8.

69. It was, however, unclear whether § 205(c) could legitimately apply to contracts executed prior to the effective date of the 1982 RRA, which lead to the passage of § 224(h).

able to the Westlands area.") (emphasis added).

### c. *December, 1987: RRA § 224(h)*

In December, 1987, Congress amended the RRA to add section 224(h), codified at 43 U.S.C. § 390ww(h), which applied § 205(c) to all recordable contracts executed prior to October 12, 1982, including the Contracts in dispute here. Section 205(c), part of the original RRA, limited the right to subsidized water to ten years from the date the recordable contract was originally executed, regardless whether the ownership period was extended by Article 13 of those recordable contracts (adding the eighteen-month grace period immediately following the resumption of land sales), and mandated "full cost" payment after that grace period.

### 4. *Discussion*

The 1963 Contract in Article 3(a) provides that Westlands shall receive water at the contract rate for the duration of the Contract, until 2003 (40 years).[70] The Contract specifies only one price for water—in Article 6(a): a ceiling of $8.00 (with $7.50 water and $0.50 drainage components). The 1963 Contract does not differentiate between the price per acre-foot for excess and non-excess lands, only requiring that the owner of the excess lands execute a recordable contract as a condition precedent to receiving water for those excess lands. There is no dispute that under the 1963 Contract, each landowner was entitled to subsidized water for excess lands during the initial ten-year period within which those excess lands had to be sold. The 1963 contract does not, on its face, absolutely limit the provision of sub-

sidized water to excess lands to a maximum of ten years.

One interpretation now advanced is that the 1963 Contract is not ambiguous, and that the landowners are entitled to the contractual (subsidized) rate for water delivered to all their land as long as they own it, including excess lands during any extension period under Article 13, caused by a condition not their fault, *e.g.*, the government's failure to adequately provide drainage service.

Undisputed evidence of the contracting parties' performance during the extension period while the D.C. district court injunction against excess land sales was in effect and afterwards proves:

(1) under Interior's (one of the contracting parties) December, 1983–87 Rules (expressly revoked[71] by Congress under RRA § 224(h)), water was delivered to excess lands during an extended period (lasting more than 20 years) at the 1963 Contract, not full-cost, rate; and

(2) the 1986 *Barcellos* Judgment refunded any "full cost" payments made for water delivered to excess lands during the extended period following the 1978 Krulitz opinion until December 30, 1986, the date of the Judgment.

### 5. *Contractual Interpretation Conclusion*

 The 1963 Contract is unambiguous with respect to water price: it sets the $8.00/acre-foot water and drainage-service rate in Article 6(a). No other contractual provision differentiates between excess and non-excess lands regarding water price, treating all land the same: "the United States shall furnish to the District,

---

**70.** Paragraph 4.1 of the 1986 *Barcellos* Judgment extended the 1963 Contract's effective period until the end of 2007.

**71.** RRA § 224(h) specifically revoked Interior's Rule that provided that the contractual

water rate applied to excess lands during the extended period. *See* 43 U.S.C. 390ww(h) (2000) ("any decision, rule, or regulation promulgated by the Department of the Interior to the contrary is hereby revoked.").

and the District, each such year, shall accept and pay, as provided in Article 6 hereof, for water from the San Luis Unit . . . ." The only prerequisite to receive San Luis Unit water for excess lands is Article 23(a)'s condition precedent that the landowner execute a recordable contract for any excess lands. Article 13 of the recordable contracts extends the ten-year ownership period during any time water or drainage service is not provided to the District's lands through no fault of the District or a water-user. It is silent about the payment rate for water and service during an extension period.

The subsequent course of performance of the parties, as shown by both the 1986 *Barcellos* Judgment and Interior's 1983 and 1987 Final Rules, is evidence that the parties, despite the political battle that raged in the Executive and Legislative branches, applied the 1963 Contract water rate uniformly to Westlands' lands, including excess lands during any extended period: Article 8 of the 1986 *Barcellos* Judgment provides that the government would not seek full-cost reimbursement for any water delivered before 1986 (a twenty-three-year period), even to excess lands. Interior Final Rule 11(i)(4), promulgated during the extension period, provided that the excess lands "may continue to receive irrigation water at the contract rate for the extended term of the [recordable] contract."

The action of a non-party, Congress, also supports the water-users' interpretation, because if the 1963 Contract rate did not apply to the excess lands, there was no need for Congress to pass § 224(h) in 1987 to retrospectively apply § 205(c)'s full-cost requirement to those lands under recordable contracts. Rather, Interior could simply have collected full cost for water delivered to excess lands within Westlands. Section 224(h) was necessary to abrogate any right to subsidized water for excess lands beyond the ten-year period.

Last, this reading also comports with the contractual analysis doctrine that every contract should be read as a whole, with the preference against interpretations that are internally inconsistent. See Trident Ctr., 847 F.2d at 566. If no subsidized water were available for excess lands beginning ten years after the recordable contracts were signed, the bargained-for promise of ten years of subsidized water would be illusory: the government could conceivably refuse to provide any water to these lands for the first ten years, which would trigger Article 13's ownership extension (because no water service was provided), but under an overly-broad reading of the 1990 *Barcellos* opinion, during that extended time, the landowner would have to pay full-cost for water. This is inconsistent with the interpretation of the contractual bargain for at least ten years of water and (drainage) service for excess lands at the subsidized rate. The same reasoning applies to lack of drainage service.[72]

The 1963 Contract and 1986 *Barcellos* Judgment give a protectable contractual right to $8.00/acre-foot water for the water-users' excess lands during any Article 13 extension periods caused by the government's failure, if any, to provide drainage service.

The analysis of what drainage service was actually provided and when, requires

---

72. *I.e.,* the parties agreed in the 1963 Contract to ten years of subsidized water and drainage service for excess lands under recordable contract. However, if drainage service has not been provided, which the *Firebaugh* remand will determine, then those ten years of "water *and* service" for the excess lands have not yet been provided (even though more than 10 years of subsidized *water* has been). In that case, Article 13 extends the ownership and contract-priced water for the excess lands until 10 total years of water *and* drainage service have been provided.

factual development to ascertain whether a failure to provide drainage "service" occurred to extend the ten years under Article 13 of the recordable contracts.

### F. Impact of RRA section 224(h)

The 1963 Contract's water rate applies to excess lands during any extension period under Article 13 of the recordable contracts. "When the United States enters into contract relations, its rights and duties therein are governed generally by the law applicable to contracts between private individuals." *Mobil Oil Exploration, Producing S.E., Inc. v. United States,* 530 U.S. 604, 120 S.Ct. 2423, 2429, 147 L.Ed.2d 528 (2000) (quoting *Winstar,* 518 U.S. at 895, 116 S.Ct. 2432).

#### 1. Applicability

The Ninth Circuit explicitly held that "Section 224(h) clearly applies" to the water-users. *Barcellos,* 899 F.2d at 820.[73] This holding is law of the case. In *Barcellos,* the Court found there was no contract right to subsidized water for more than ten (10) years, because Article 13 "service" did not encompass Interior's approval of land sales.

In this case by contrast, an Article 13 extension may operate, once the disputed factual determination is made what "drainage service" means for the purposes of extension of the ten-year period. *Firebaugh* establishes "drainage service" has not been provided, at least since 1986. This does not end the inquiry.

#### 2. Impact

RRA § 224(h), in combination with RRA §§ 205(a)-(c), abrogate the contractual right to receive CVP water at the 1963

Contract water and drainage-service price, as interpreted by the 1986 Judgment (¶ 4), because together those RRA sections mandate, as of § 224(h)'s effective date, December 22, 1987, that the Bureau charge the "full cost" rate for water to excess lands, not the contractual $8.00/acre-foot rate, and revoke Interior's rules to the contrary. *See* 43 U.S.C. §§ 390ee(a)-(c); 390ww(h) (2000). This abridgement of a U.S. government contractual right requires analysis of the unmistakability and sovereign acts defenses.

#### 3. Government Defenses: Unmistakability and Sovereign Acts Doctrines

The government argues that even if a contractual right to the subsidized water rate for excess lands during any Article 13 extension periods caused by the failure to provide drainage existed under the 1963 Contract, it is nevertheless excused from any breach caused by § 224(h)'s full-cost requirement, based upon Congress' sovereign power to legislate.

 "[P]unctilious fulfillment of contractual obligations is essential to the maintenance of the credit of public as well as private debtors." *Winstar,* 518 U.S. at 885 & n. 29, 116 S.Ct. 2432 (citing *Lynch v. United States,* 292 U.S. 571, 580, 54 S.Ct. 840, 78 L.Ed. 1434 (1934) (Brandeis, J.); Kyle D. Logue, Tax Transitions, *Opportunistic Retroactivity, and the Benefits of Government Precommitment,* 94 MICH. L. REV. 1129, 1146 (1996) ("If we allowed the government to break its contractual promises without having to pay compensation, such a policy would come at a high cost in terms of increased default premiums in future government contracts and increased disenchantment with the govern-

---

**73.** No consideration, aside from rational basis review, was given to the retroactive application of the "full cost" rate or the legal effect of the later legislation on the 1963 Contract and the 1986 *Barcellos* Judgment. *Barcellos*

analyzed the enactment of Interior Rule 11(i)(4) as not giving rise to a constitutionally-protectable expectation that could not be overridden by Congressional passage of RRA § 224(h). *See Barcellos,* 899 F.2d at 825.

ment generally.") (citing RICHARD A. POS-NER, ECONOMIC ANALYSIS OF LAW 81 (3d ed.1986))). "The United States are as much bound by their contracts as are individuals. If they repudiate their obligations, it is as much repudiation, with all the wrong and reproach that term implies, as it would be if the repudiator had been a State or a municipality or a citizen." *Lynch,* 292 U.S. at 580, 54 S.Ct. 840 (quoting *Central Pac. R.R. Co. v. United States (The Sinking Fund Cases),* 99 U.S. 700, 719, 9 Otto 700, 25 L.Ed. 496 (1878)). Another reason the government should be held to its contractual promises "is to serve 'the Government's own long-run interest as a reliable contracting partner in the myriad workaday transactions [sic] of its agencies.'" *Bellevue Manor Assocs. v. United States,* 165 F.3d 1249, 1253 n. 3 (9th Cir.1999) (quoting *Winstar,* 518 U.S. at 883, 116 S.Ct. 2432 (Souter, J.)) (misquote in original); *see also Madera Irrigation Dist. v. Hancock,* 985 F.2d 1397, 1401 (9th Cir.1993) ("But too liberal an interpretation of the residual sovereign power of the government to override its contractual commitments would eviscerate the government's power to bind itself to contracts. In addition to the moral offensiveness of allowing the government to break its promises, too liberal a construction would have the paradoxical consequence of weakening the sovereign power to implement policy.") (citing *Perry v. United States,* 294 U.S. 330, 351–54, 55 S.Ct. 432, 79 L.Ed. 912 (1935)).[74]

### a. *Unmistakability doctrine*

■ "The Unmistakability Doctrine provides that contracts limiting the government's future exercise of regulatory au-thority must be expressed in unmistakable terms." *Far W. Fed. Bank v. Office of Thrift Supervision–Dir.,* 119 F.3d 1358, 1365 n. 3 (9th Cir.1997) (citing *Winstar,* 518 U.S. at 872, 116 S.Ct. 2432 ("Sovereign power governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms.") (quoting *Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment,* 477 U.S. 41, 52, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986) (quoting *Merrion v. Jicarilla Apache Tribe,* 455 U.S. 130, 148, 102 S.Ct. 894, 71 L.Ed.2d 21 (1982) (quoting *St. Louis v. United R. Co.,* 210 U.S. 266, 280, 28 S.Ct. 630, 52 L.Ed. 1054 (1908))))) (alteration, internal quotation marks, and ellipsis omitted). What the standard is remains unclear: "Courts have struggled with the meaning of *Winstar.*" *Pitney Bowes Inc. v. United States Postal Serv.,* 27 F.Supp.2d 15, 23 (D.D.C.1998) (applying *Winstar* to hold the unmistakability doctrine did not shield the government when it passed regulations that ceased allowing the plaintiffs to keep interest on specified funds) (quoting *Tamarind Resort Assocs. v. Gov't of the Virgin Islands,* 138 F.3d 107, 112 (3d Cir.1998) (citing *Yankee Atomic Elec. Co. v. United States,* 112 F.3d 1569, 1578–79 (Fed.Cir.1997))). *Winstar* examined "contracts" between the Federal Home Loan Bank Board and thrifts that allowed these healthy thrifts to acquire failing thrifts and count as "supervisory goodwill" the difference between the purchase price and the fair market value of all the identifiable assets of the acquired thrift. *See Winstar,* 518 U.S. at 845–50, 116 S.Ct. 2432. The reason for this treatment was to induce purchase of these failing thrifts, because the Federal

---

**74.** *I.e.,* if the government continually enters contracts and subsequently legislates over them, it will lose bargaining credibility, because other contracting parties will lack trust that it will fulfill its promises. This will lead to contract uncertainty, which will in turn lead to higher transaction costs, *e.g.,* parties contracting with the government will attempt to place every possible contingency within the contract to prevent any legislative problems, which would be inefficient.

Savings and Loan Insurance Corporation lacked the funds to liquidate the failing thrifts itself. *See id.* at 847, 116 S.Ct. 2432; 849–50 ("Recognition of goodwill under the purchase method was essential to supervisory merger transactions of the type at issue in this case."). Under special accounting practices, this supervisory goodwill could be counted towards meeting the reserve capital requirements imposed by federal regulations. *See id.* at 848, 116 S.Ct. 2432 (citing Congressional testimony).

However, Congress passed the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub.L. 101–73, 103 Stat. 183, which, *inter alia*, phased out by 1985 the ability of thrifts to count supervisory goodwill as part of their reserves. *See id.* at 856–57, 116 S.Ct. 2432. As a result of FIRREA's new capital requirements, "many institutions [including the *Winstar* plaintiffs] immediately fell out of compliance with regulatory capital requirements, making them subject to seizure by thrift regulators." *Id.* at 857–58, 116 S.Ct. 2432 (citing William K. Black, *Ending Our Forebearers' Forbearances: FIRREA and Supervisory Goodwill,* 2 STAN. L. & POL'Y REV. 102, 107 (1990)).

The plaintiffs acquired failed thrifts before the enactment of FIRREA, thrifts that federal regulators thereafter seized and liquidated for failure to meet FIRREA's new capital reserve requirements, which limited the ability to include "supervisory goodwill." *See id.* at 858, 116 S.Ct. 2432. Because they believed that the Bank Board had promised them that they

could continue to count the supervisory goodwill towards the required capital requirements, plaintiffs sued the United States for damages based on contractual and constitutional theories of recovery. *See id.* The Supreme Court in a plurality decision rejected the government's proffered defenses of the unmistakability and sovereign acts doctrines, affirming the lower courts' findings of liability against the government for breaching its "contractual" promise with these thrifts to continue to allow them to count supervisory goodwill as part of their required reserves.

 One formulation of the unmistakability doctrine is that it applies only when "enforcement of the contractual obligation alleged would block the exercise of a sovereign power of the Government." *Id.* at 879, 116 S.Ct. 2432 (Souter, J.).[75] Justice Souter, in his plurality opinion, gave two examples at differing ends of the "wide spectrum" of contracts protected and not protected by the unmistakability doctrine: "humdrum supply contracts" (not protected) versus "a claim for rebate under an agreement for a tax exemption" (protected, because "[g]ranting a rebate, like enjoining enforcement, would simply block the exercise of the taxing power.") *Id.* If the unmistakability doctrine applies, whichever version, no breach of contract claim based on subsequent Congressional action lies against the government, unless the contract expressly contains limitations (an unmistakable waiver) against future regulatory authority.[76]

Although seven Justices formed the majority to support the *Winstar* unmistaka-

---

75. If "a contract is reasonably construed to include a risk-shifting component that may be enforced without effectively barring the exercise of [a power peculiar to the government], the enforcement of the risk allocation raises nothing for the unmistakability doctrine to guard against, and there is no reason to apply it." *Id.* at 880 (Souter, J.).

76. For a discussion of a few cases decided post-*Winstar,* see Joshua I Schwartz, *The Status of the Sovereign Acts and Unmistakability Doctrines in the Wake of* Winstar: *An Interim Report,* 51 Ala. L.Rev. 1177 (2000).

bility judgment (*i.e.*, that it did not shield the government from liability), there was not a majority opinion, and the four separate opinions [77] are thoroughly fragmented, not articulating any unified analysis in support of the judgment based on either the unmistakability or sovereign acts doctrines.

Five Justices disagreed with the conclusion that the unmistakability doctrine was not available simply because the contracts were risk-shifting agreements. However, three of them, Justices Scalia, Thomas, and Kennedy, nevertheless concurred in the judgment, because they interpreted the government's actions as conveying an unmistakable promise to continue the favorable regulatory treatment. *See Winstar*, 518 U.S. at 920–22, 116 S.Ct. 2432 (Scalia, J., concurring in the judgment). The breakdown is:

(1) Six Justices agree that the unmistakability doctrine mandates that the "[s]overeign power governs all contracts subject to the sovereign's jurisdiction, and will remain intact unless surrendered in unmistakable terms."

*Id.* at 872, 116 S.Ct. 2432 (quoting *Pub. Agencies Opposed to Soc. Sec. Entrapment*, 477 U.S. 41, 52, [106 S.Ct. 2390, 91 L.Ed.2d 35] (quoting *Merrion*, 455 U.S. at 148, 102 S.Ct. 894)) (alteration added and ellipsis omitted).

(2) Six Justices agree that such waiver must be in the form of a "second promise" not to legislate over the contract. (Three Justices explicitly hold that no such promise is necessary).

(3) Only Four Justices agree whether the doctrine's applicability turns on if a "sovereign power" is implicated, *i.e.*, the type of contract. *See id.* at 879, 116 S.Ct. 2432. (Two Justices explicitly hold that the doctrine applies to *all* contracts with the government).

(4) Three Justices formulate the doctrine as a type of "reverse presumption," *i.e.*, the unmistakability doctrine eschews the normal contract rule that parties impliedly promise not to make their performance under the contract impossible. *See id.* at 920–21, 116 S.Ct. 2432 (Scalia, J., concurring in the judgment).[78]

---

**77.** Justice Souter announced the judgment of the Court, and was joined by Justices Stevens and Breyer and Justice O'Connor, in part. Justice Breyer wrote a separate concurring opinion, which no other Justice joined. Justice Scalia wrote a separate concurring opinion, joined by Justices Thomas and Kennedy. Justice Rehnquist authored a dissent, which Justice Ginsburg joined in part.

**78.** Justice Scalia states:

In my view, the doctrine has little if any independent legal force beyond what would be dictated by normal principles of contract interpretation. It is simply a rule of presumed (or implied-in-fact) intent. Generally, contract law imposes upon a party to a contract liability for any impossibility of performance that is attributable to that party's own actions. That is a reasonable estimation of what the parties intend. When I promise to do *x* in exchange for your doing *y*, I impliedly promise not to do anything

that will disable me from doing *x*, or disable you from doing *y*—so that if either of our performances is rendered impossible by such an act on my part, I am not excused from my obligation. When the contracting party is the government, however, it is simply *not* reasonable to presume an intent of that sort. To the contrary, it is reasonable to presume (*unless the opposite clearly appears* ) that the sovereign does *not* promise that none of its multifarious sovereign acts, needful for the public good, will incidentally disable it or the other party from performing one of the promised acts. The requirement of unmistakability embodies this reversal of the normal reasonable presumption. Governments do not ordinarily agree to curtail their sovereign or legislative powers, and contracts must be interpreted in a commonsense way against that background understanding.

*Id.* (emphasis in original).

As a result of these shifting positions, it appears particularly problematic to predict which unmistakability standard applies to any specific contract.

Unfortunately, but not unsurprisingly, given the Supreme Court opinion, the few cases applying the unmistakability doctrine after *Winstar* (most from the Federal Circuit) also diverge in their formulation and interpretation of the doctrine. For example, in *Yankee Atomic Electric Co.*,[79] the Federal Circuit applied *Winstar* to hold that the government's imposition of special assessments for clean-up of former uranium enrichment plants under a Congressional Act[80] did not violate any rights of the plaintiffs, who were nuclear power plants owners that had fully performed contracts with the United States for the purchase of uranium at fixed prices. These plaintiffs argued that by assessing them for cleanup costs for past use of the uranium, the government had in essence retroactively increased the price they must pay for that uranium, a price that was firmly set in their contracts. The court's conclusion that the unmistakability doctrine nevertheless shielded the government from liability in this situation rests on its finding that the Act was "a general exercise of Congress's taxing power for the purpose of addressing a societal problem rather than an act that retroactively increases the price charged to contracting parties for uranium enrichment services." *Id.* at 1577. This panel rejected the (ap-

parent) five-Justice majority holding that the unmistakability doctrine applies regardless of the nature of the underlying contract, *see id.* at 1579,[81] and instead applied a different *Winstar* holding (probably only supported by four Justices—the Souter view) that "application of the unmistakability doctrine turns on whether the enforcement of the contractual obligation would effectively block the exercise of a sovereign power of the Government," *id.* at 1579 (quoting *Winstar*, 518 U.S. at 879 (Souter, J.)). Because the special assessment at issue implicated the sovereign power of taxing authority, the Court found that the unmistakability doctrine applied. *See id.*[82] Last, the panel applied the six-Justice majority holding that demands that the government make an unmistakable "second promise" not to subsequently exercise its sovereign power to act in the challenged manner, or the unmistakability doctrine insulates it from contractual liability. *See id.* at 1579–80. The Court finally found that "the fixed-price terms of the contract do not constitute an unmistakable promise on behalf of the Government that it will not impose a general assessment [for cleanup] upon all utility companies that benefitted from the DOE's uranium enrichment services," *id.* at 1580, so the unmistakability doctrine insulated the government.

In *Adams v. United States*,[83] the unmistakability defense applied to insulate the government against breach of contract

---

**79.** 112 F.3d at 1569.

**80.** Energy Policy Act of 1992 (creating the Uranium Enrichment Decontamination and Decommissioning Fund).

**81.** Presumably, the five Justices are the three concurring Justices (Scalia, Kennedy, and Thomas) and the two dissenters (Rehnquist and Ginsburg).

**82.** The panel employed the questionable reasoning that because the plaintiffs sought mon-

ey damages, they essentially blocked the "exercise of this sovereign power to tax, for if [they] were to prevail, the Government would be required to refund the entire amount assessed. This is akin to a tax rebate, which even the plurality seemed to recognize as a blocking of the exercise of sovereign power." *Id.* (citing *Winstar*, 518 U.S. at 879, 116 S.Ct. 2432 (citing *Bowen*, 477 U.S. at 51, 106 S.Ct. 2390)).

**83.** 42 Fed. Cl. 463 (Fed.Cl.1998).

claims by rental housing project owners who had loan agreements/contracts with the Farmers Home Administration ("FmHA") that gave them prepayment terms, which were impaired by subsequent Congressional action. Unlike the previous case, the *Adams* panel applied the five-Justice (Justice Scalia concurrence (3) and Justice Rehnquist dissent (2)) majority's reasoning that "the unmistakability doctrine applies even if the contract can be reasonably construed as a risk-shifting agreement and the enforcement of the agreement would not effectively bar the exercise of a sovereign power." *Id.* at 482 (citing *Winstar*, 518 U.S. at 919, 116 S.Ct. 2432 (Scalia, J.)). It found that the mortgage agreements did not have the second promise to "guarantee the prepayment option against future acts of Congress," so the unmistakability defense applied. *See id.* at 483–84. However, this conclusion may be driven by two additional considerations touched upon by the court: (1) the mortgage agreements made the contract terms "subject only to 'FmHA's future regulations not inconsistent with the express provisions hereof.' No such commitment regarding possible statutory enactments appears in the language of the loan and mortgage documents, and future regulations of FmHA are not synonymous with future acts of Congress," *id.* at 484; and (2) "the prepayment options included in varying terms in the plaintiffs' contracts have not been demonstrated by the plaintiffs before this court to be 'essential to the contract between the parties,'" *id.* at 485 (quoting *Winstar*, 518 U.S. at 909, 116 S.Ct. 2432). The court seems to adopt the six-Justice majority holding that a specific "second promise" must be made in order to overcome the unmistakability defense, and also the three-Justice non-majority holding that the legislated-over contractual

term must be "essential" to the contract for the government to breach the contract and seek the unmistakability defense.

*Barsebäck Kraft AB v. United States* [84] rejects a breach of contract claim against the government based on a change in the method it used to calculate the price for uranium enrichment services provided under contracts it held with plaintiffs. The court distinguished *Winstar* because the contract at issue in *Barsebäck Kraft AB* stated "the charges to be paid to DOE for enrichment services provided to the Customer hereunder will be determined in accordance with the established DOE pricing policy for such services," which was defined in the contract as "any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services under this contract," *id.* at 1477–78 (quoting contract articles), thereby placing the risk on the plaintiffs, *see id.* at 1481 ("this case is the other side of the *Winstar* coin."). The *Barsebäck* contract specifically provided the contract provisions were subject to subsequent legislative changes by the pricing language: "any policy" applicable to prices or charges in effect at the time the uranium enrichment services were performed. The court concluded that no contractual promise had been broken and found it unnecessary to reach the unmistakability defense.

In 2000, *General Dynamics Corp.* combined the unmistakability doctrine with the sovereign acts doctrine (discussed *infra*) by imputing the requirement that the purported sovereign act be "public and general" in order for the unmistakability doctrine to apply. *See Gen. Dynamics Corp.*, 47 Fed. Cl. at 545.

Most recently, *Schism v. United States* [85] appears to reformulate the unmis-

---

**84.** 121 F.3d 1475 (Fed.Cir.1997).

**85.** 239 F.3d 1280, 1290 (Fed.Cir.2001).

takability doctrine: "the terms of a government contract, like any other contract, do not change with the enactment of subsequent legislation, absent a specific contractual provision providing for such a change." *Id.* at 1290 (citing *Winstar*, 518 U.S. at 839, 116 S.Ct. 2432). There, the court held that the United States breached its "contract" with veterans by requiring them to rely on Medicare health benefits when they turned 65, rather than providing the free "lifetime medical care" from the military that the recruiters had promised in order to induce them to initially enlist and serve at least twenty years. Aside from quoting language from *Winstar* regarding the federal government's duty to not avoid its contractual obligations by subsequent legislation, the court did not apply any unmistakability doctrine requirements, but rather simply held that government lacked power to divest the servicemen's contractual rights to medical care, even though it enacted laws that purported to so do. *See id.* at 1290–91. This decision seems to depart from *Winstar*'s five-Justice majority holding that the unmistakability doctrine applies unless a second unmistakable promise is made, and instead holds that if the contract in question does not make itself subject to future legislation, then it is immune.

Unmistakability analysis has been applied to include at least four discrete components: (1) existing contractual right;[86] (2) impairment of that right; (3) implication of a sovereign power (arguably); and (4) unmistakable waiver of sovereign authority within the contract, *i.e.*, second promise (or at least Justice Scalia's application of the reverse presumption).

 Here, the first requirement is met: the 1963 Contract contains a right to a $7.50/acre-foot water and $0.50/acre-foot drainage-service rate for excess lands during Article 13 ownership extension periods caused by lack of water or drainage service. Subsequent legislation, RRA sections 205(c) and 224(h), impair that right, because they increase the cost to "full cost" payment for water delivered to excess lands.[87]

---

86. *See, e.g., Stohler v. Menke*, 998 F.Supp. 836, 839 (E.D.Tenn.1997) (refusing to apply *Winstar* to claim that Congressional change in reimbursement formula for medical services at lower Medicaid, rather than Medicare Part B, level violated plaintiffs' contractual rights, because no contractual right to such reimbursement existed, but rather was only made under a statutory interpretation of the applicable rate, an interpretation that was nascent).

87. The prefatory language in the 1963 Contract: "This Contract, made ... in pursuance generally of the Act of June 17, 1902 (32 Stat. 388), and acts amendatory thereof or supplementary thereto," is distinguishable from the language in *Barsebäck Kraft AB*, because there, the contract specifically left the yearly uranium enrichment pricing subject to subsequent legislation by defining the price as that under "any policy established by DOE that is applicable to prices or charges in effect at the time of performance of any services."

Here, in contrast, there is simply prefatory language that indicates that the amendments and supplements to the 1902 Act up until the date of the 1963 Contract applied to the Contract. Nowhere is the water price subjected to future rules as may be in effect when it is delivered. This exact contractual language has previously been interpreted as not expressly subjecting the 1963 Contract to subsequent legislation. *See Westlands Water Dist. v. United States Dep't of Interior, Bureau of Reclamation*, 850 F.Supp. 1388, 1405–07 (E.D.Cal.1994) ("The interpretation offered by the government would amount to a reservation of 'an unlimited right to escape its contractual obligations,' a disfavored construction which renders the government's promises 'illusory and the contract void.'"); *accord Barcellos & Wolfsen*, 849 F.Supp. at 722 (interpreting the prefatory language of Article 11 of the 1963 Contract, which specifically limited the damages against the government in the possibility of water shortage).

The difficult question is whether a sovereign power is implicated. *Winstar*'s divergent holdings may vitiate this requirement, *i.e.*, Justices Rehnquist and Ginsburg clearly write that the doctrine applies to all government contracts, and Justices Scalia, Kennedy, and Thomas question the necessity of a sovereign power implication requirement, *see id.* at 919, 116 S.Ct. 2432.

Sections 205(c) and 224(h) require only that a higher price ("full cost") be charged for governmental resources: water and drainage service. The 1963 Contract is analogous to the example given by Justice Souter in *Winstar* of a contract to which the unmistakability doctrine does not apply, *e.g.*, a supply contract for procuring food for the army.[88] *But see Winstar Corp.*, 518 U.S. at 919–20, 925–36, 116 S.Ct. 2432 (possibly five votes for applying doctrine to any contracts with the government). For example, if the government entered a contract with a food wholesaler to sell beans to that party at $x/1b. for 20 years, and during the contract term passed legislation that required that all federally-supplied beans must be sold at no less than "full cost," $(x+1)/1b., the government could not shield itself from its contractual obligation by application of the unmistakability doctrine, because a bean-supply contract does not implicate a sovereign power. So too here. Charging "full cost" for all water implicates a water-pricing term in a water-delivery contract, but does not implicate a sovereign power, even if navigation of waterways may. This is a contract for delivery of a commodity (water) and service (drainage). Section 224(h) seeks to override the contract and raise the water price.

Where no sovereign power is implicated under the 1963 Contract or the 1986 *Barcellos* Judgment, it is unnecessary to determine whether the government unmistakably waived its power to legislate as to those contracts. A parity of reasoning applies to rebut the Justice Scalia reverse presumption, because the "essential" term of the 1963 Contract is the pricing per acre-foot for water and drainage service.

The unmistakability doctrine does not insulate the government from performing the water-pricing terms of the 1963 Contract, the recordable contracts, and the 1986 *Barcellos* Judgment.

### b. Sovereign Acts doctrine

"The Sovereign Acts doctrine provides that government as contractor cannot be held liable for the acts of government as regulator." *Far W. Fed. Bank*, 119 F.3d at 1365 n. 3. The sovereign acts doctrine shields the government from breach of contract liability when it undertakes "public and general" acts that have the incidental effect of modifying contracts it has with private persons. *See Winstar*, 518 U.S. at 891–94, 116 S.Ct. 2432. "A governmental act will not be public and general if it has the substantial effect of releasing the Government from its contractual obligations." *Gen. Dynamics Corp.*, 47 Fed. Cl. at 541 (quoting *id.* at 899, 116 S.Ct. 2432). Even if the government shows that the act is "public and general," it must also "show that the passage of the statute rendering its performance impossible was an event contrary to the basic assumptions on which the parties agreed ...." *Winstar*, 518 U.S. at 904, 116 S.Ct. 2432 (analogizing to the impossibility de-

---

**88.** It is possible to construe any government contract as implicating a sovereign power by virtue of the government's role as a contracting party, *e.g.*, the army food contract could be viewed as implicating the sovereign power to regulate the nation's armed forces. However, as *Winstar* shows from its facts, the implicated sovereign power should be construed narrowly.

fense for breach of contract). "In *Winstar*, the plurality explained that the doctrine is designed to distinguish between the Government's twin roles as contractor and sovereign." *Yankee Atomic Elec. Co.*, 112 F.3d at 1574–75 (citing *Winstar*, 518 U.S. at 892, 116 S.Ct. 2432 (quoting *Horowitz v. United States*, 267 U.S. 458, 461, 45 S.Ct. 344, 69 L.Ed. 736 (1925))). "The Government-as-contractor cannot exercise the power of its twin, the Government-as-sovereign, for the purpose of altering, modifying, obstructing or violating the particular contracts into which it had entered with private parties." *Id.*

As with the unmistakability doctrine, no consensus regarding the sovereign acts doctrine exists under *Winstar*. Justice O'Connor did not join Justice Souter's plurality addressing the "public and general" requirement for applicability of the sovereign acts doctrine (Sections IV–A and B), nor did she write separately on the point. Justice Ginsburg joined the Rehnquist dissent, but not the part of his dissent addressing the sovereign acts doctrine (Part III), failed to join any other opinion, and did not write separately on the sovereign acts doctrine. What *Winstar* leaves is a 3–1 splintering (Justices Souter, Stevens, and Breyer versus Justice Rehnquist) in favor of the "public and general" requirement for application of the sovereign acts defense. In the minority, Justice Rehnquist applies the sovereign acts defense to relieve the government from contractual liability whenever its legislative act has a general "regulatory" purpose, regardless whether a significant impact of that action relieves the government of its contractual obligations. *See id.* at 933–34, 116 S.Ct. 2432 (Rehnquist, J., dissenting). The last three Justices, Scalia, Kennedy, and

Thomas, believe "the 'sovereign acts' doctrine adds little, if anything at all, to the 'unmistakability' doctrine, and is avoided whenever that one would be ...." *Id.* at 923, 116 S.Ct. 2432 (Scalia, J., concurring in the judgment).

In *Scott Timber Co. v. United States*,[89] a timber contractor brought suit contending the government breached timber sales contracts when it suspended them from logging in order to protect the marbled murrelet,[90] prompted by a TRO issued by a district court that prohibited the logging on any habitat of the threatened species. *See id.* at 172–73. The court applied the (Souter three-Justice) sovereign acts doctrine, which it found consisted of two prongs:

First, the court must ask whether the action that impedes the government's performance of the contract is in fact a "sovereign act," that is, whether the act is "public and general" and therefore attributable to the government as sovereign. An act of government is considered public and general, in turn, so long as the impact on public contracts is "merely incidental to the accomplishment of a broader governmental objective."

If the court finds that the government action which prevents performance of the contract is, in fact attributable to the government as sovereign, then the court must determine in the second step of its analysis whether the government as contractor should be discharged from liability under the common law doctrine of impossibility. To successfully show that the government should be shielded from liability under the impossibility defense, "the Government like any other defend-

---

**89.** 44 Fed. Cl. 170 (Fed.Cl.1999), *amending Scott Timber Co. v. United States*, 40 Fed. Cl. 492 (1998).

**90.** *See, e.g., The Marbled Murrelet*, at http://www.foer.org/murrelet.htm (last visited Feb. 23, 2001) (last modified Nov. 13, 2000).

ing party in a contract action, must show that the sovereign act rendering its performance impossible was an event contrary to the basic assumption of the parties." Put differently, to satisfy the second prong of the sovereign acts defense, the government must show that the "nonoccurrence of the sovereign act was a basic assumption of the contract." *Scott Timber Co.*, 40 Fed. Cl. at 507–08 (internal quotations and alteration marks omitted). There, the government could not satisfy the second prong, because the contracts themselves anticipated that additional species would be added to the list of endangered or threatened species, and thus, the government could not show that the non-occurrence of the listing was a basic assumption of the contract. *See id.* at 508.

 Here, applying the first step of the three-Justice version of the sovereign acts doctrine, as did *Scott Timber Co.*, the government cannot meet the first prong: a public and general requirement (or even Justice Rehnquist's regulatory construct). The 1963 Contract has a singular overriding purpose: the government supplies a specified volume of water (and drainage service) to Westlands at a subsidized price ($8.00/acre-foot) over a defined time period (40 years). Section 224(h) raises the acre-foot water price to "full cost," specifically targeting Westlands and recordable contract contractors with low, fixed-rate water contracts, arising from the legislators' concern with over-subsidizing "rich corporations and large farmers." *See, e.g.* 133 Cong. Rec. E4995–02 (extension of remarks, Dec. 22, 1987) (statement of Rep. George Miller); 133 Cong. Rec. E335–01 (extension of remarks, Feb. 3, 1987) (statement of Rep. George Miller); H.R. Conf. Rep. No. 495, 100th Cong., 2d Sess. 786.[91]

There is no "broader governmental objective" to RRA § 224(h), other than to target contractors who had contractual promises for a (low) fixed price per acre-foot for CVP water. The RRA provision is not public and general, because its impact on the 1963 Contract is not "merely incidental" to, *e.g.*, some broader regulatory scheme. *See, e.g., Adams*, 42 Fed. Cl. at 478–80 ("Applying the defense in such a situation would improperly grant the government carte blanche to avoid liability for any contractual commitment to its citizens merely by enacting legislation repudiating the commitment. Assuredly, no private party has that luxury."). The sovereign acts defense does not apply.

c. *Effect of Article 26 of the 1963 Contract*

 Article 26 of the 1963 Contract[92] provides in material part: "... in the event that the Congress amends the excess-land provisions or other provisions of the Federal reclamation laws, the United States agrees, at the option of the District, to negotiate amendments of appropriate articles of this contract, all consistently with the provisions of such repeal or amendment." The amendments to the federal reclamation laws after 1963 gave the District the option to negotiate amendments of appropriate articles of the 1963 Contract, consistent with the provisions of such amendments. Assuming that the addition of § 224(h) was such an amendment of the federal reclamation laws, negotiations by the District were unsuccessful to retain the contract price for water service furnished during any period of extension to the excess lands under recordable contracts. Although unnecessary to the analysis for reasons stated above, Article 26 is an express reservation of authority to

---

**91.** At that time, there was only a handful of pre–1982 contracts for subsidized water to which Section 224(h) applies.

**92.** Article 12 of the recordable contracts is essentially the same.

amend the federal reclamation laws, not a waiver of the sovereign power to do so. *See, e.g., Westlands Water Dist.,* 850 F.Supp. at 1406–07 (rejecting that Article 23 was an unmistakable waiver of sovereign power to legislate) (citing *Peterson,* 899 F.2d at 812).

### d. *Conclusion*

RRA section 224(h) abridges the contractual right to subsidized water for excess lands during any Article 13 extension period caused by the government's failure to provide water or drainage service. Neither the unmistakability doctrine nor the sovereign acts doctrine shields the government from the breach caused by section 224(h).

### G. *Jurisdiction over the Unjust Enrichment Counter–Claim*

#### 1. *Offset*

The Government argues summary judgment is appropriate, claiming that regardless whether the counter-claims for restitution for drainage-component payments are legally sufficient, there is nevertheless no independent waiver of sovereign immunity that allows the water-users to bring an unjust enrichment counterclaim to recover the drainage component previously paid by water-users to Westlands for the government. *See* Doc. 327 at 2.

■■■■ "The United States, as the sovereign, is immune from suit unless express permission to sue it has been granted by Congress." 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1427, at 194 (3d ed.1990) (footnote omitted). "When sovereign immunity is at issue, the government is immune from a suit, whether couched as an original claim or as a counter claim, unless it has waived its immunity." *United States v. $277,000 U.S. Currency,* 69 F.3d 1491, 1493 (9th Cir.1995) (citing *United States v. Lockheed L–188 Aircraft,* 656 F.2d 390 (9th Cir.1979)). That the Government brought this suit is of no consequence: "there is no 'implied waiver' of sovereign immunity as to counterclaims based on the government's commencement of an action." *Presidential Gardens Assocs. v. United States,* 175 F.3d 132, 140 (2d Cir.1999).

The cases cited by the water-users are not to the contrary. In both *Northern Cheyenne Tribe v. Lujan,* 804 F.Supp. 1281 (D.Mont.1991), and *A.T.C. Petroleum, Inc. v. Sanders,* 860 F.2d 1104, 1113 (D.C.Cir.1988), private parties sued the United States under unjust enrichment theories. In each case, there was an independent waiver of sovereign immunity.[93] *See A.T.C. Petroleum, Inc.,* 860 F.2d at 1113 (discussing the Small Business Association, for which Congress has expressly waived sovereign immunity); *N. Cheyenne Tribe,* 804 F.Supp. at 1288 ("Where a fed-

---

**93.** Neither *United States v. California,* 932 F.2d 1346 (9th Cir.1991), nor *Atlantic Coast Line Railroad Co. v. Florida,* 295 U.S. 301, 55 S.Ct. 713, 79 L.Ed. 1451 (1935), supports the water-users' position that "private parties may maintain actions for equitable relief against the government." In *California,* the United States was trying to maintain a quasi-contract action against a state. *See id.,* 932 F.2d at 1350. In *Atlantic Coast Line,* recovery was not sought against the United States. Rather, freight charges were collected by a railroad carrier pursuant to an order of the Interstate Commerce Commission ("ICC"). *See id.,* 295 U.S. at 305, 55 S.Ct. 713. The ICC order was reversed by the Supreme Court because the findings were "incomplete and inadequate." *See id.* After taking new evidence and making new findings, the ICC "made the same order it had made before," and the Supreme Court upheld the order. *See id. Atlantic Coast Line* decided whether restitution was owing from the carrier to its customers for the rates collected while the first order was in force. *See id.*

eral common law claim seeking equitable relief *is coupled with a waiver of sovereign immunity* ... federal district courts have original jurisdiction to hear such claims.") (citing cases) (emphasis added).

This rule is, however, subject to one very narrow exception: where a party seeks simply to offset the amount of the sovereign's recovery. *See Presidential Gardens Assocs.*, 175 F.3d at 140 (citing *United States v. Forma*, 42 F.3d 759, 764 (2d Cir.1994)). "As the Ninth Circuit has put it, though 'a suit in the name of the United States does not amount to a waiver of sovereign immunity subjecting the United States to an affirmative adverse judgment on a counterclaim, the counterclaim may be asserted against a sovereign by way of set off or recoupment to defeat or diminish the sovereign's recovery.'" *Forma*, 42 F.3d at 764 (quoting *United States v. Agnew*, 423 F.2d 513, 514 (9th Cir.1970)) (citing other sources) (alteration marks and ellipsis omitted); *see also* 6 CHARLES ALAN WRIGHT, ARTHUR R. MILLER, & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 1427, at 197 (3d ed. 1990) ("Despite the sovereign immunity doctrine ..., when the United States institutes an action, [a] defendant may assert by way of recoupment any claim arising out of the same transaction or occurrence as the original claim in order to reduce or defeat the government's recovery.") (citing cases).[94]

■ The water-users' allegation that the United States is not entitled to retain the monies collected by Westlands for the drainage-service component of the per-acre-foot water rate is in substance based on offset. The government argues that the water-users owe the difference between the full cost rate for excess lands and the contractual rate that the water-users paid. The water-users rejoin that they paid for drainage as a component of the per acre-foot water payments and did not receive drainage, entitling them to return of those funds under an unjust enrichment counterclaim. *See, e.g.*, 1 B.E. WITKIN, SUMMARY OF CALIFORNIA LAW (CONTRACTS) § 91, at 122 (9th ed. 1987) ("When one obtains a benefit which he may not justly retain, he is unjustly enriched.... [Unjust enrichment] is designed to restore the aggrieved party to his former position by return of the thing or its equivalent in money.") (quoting sources).

The water-users assert an offset counterclaim; to the extent any funds are due them for the absence of drainage service, that amount may decrease any amount they owe for water-service payments less than the full-cost rate.[95] Under *Presidential Gardens Assocs.*'s offset (recoupment) exception to sovereign immunity, jurisdiction exists to hear the water-users' counterclaim for unjust enrichment premised on not receiving drainage service.[96]

---

94. *E.g.*, in *United States v. Iron Mountain Mines, Inc.*, 812 F.Supp. 1528, 1551–52 (E.D.Cal.1992), the United States' CERCLA claims were found to be subject to defendant's offset claim for damage to its equipment, facilities, and minerals caused by the government, because such damage arose from the same transaction or occurrence as the United States' action. The court rejected the government's position that the recoupment claim must be identical to that sought by the government, *i.e.*, that its action was under CERC-

LA and the defendant's action was based in tort.

95. *I.e.*, for purposes of offset, (Water underpayment)—(drainage overpayment) = Government's recovery ≥ 0.

96. Any recoupment for the water-users based on the $0.50 drainage component is, of course, limited to defeating the government's recovery, *i.e.*, to the extent the drainage recoupment reduces liability for the full-cost

### 2. *Orff Does Not Govern*

This case is distinguishable from *Orff*'s jurisdictional analysis. There, water-users sought to directly enforce, as intended third-party beneficiaries, Westlands' contractual rights under its water-service agreement with Interior. *See Orff v. United States*, CIV–F–93–5217 (April 12, 2000) (*Orff* Doc. 634). Westlands was not a party and did not seek enforcement of the contract. Here, Westlands, the contractor, has interpled all water-service and drainage assessments for the disputed period. The water-users are real parties-in-interest against the United States in the dispute over their entitlement to funds they paid under direct contract with the government, which are deposited with the court. No one else is willing to litigate these claims on their behalf. A res in the form of money held by the court, over which there is an entitlement dispute, is a different and independent basis for jurisdiction. *See, e.g., Miranne v. First Fin. Bank, F.S.B. (In re Miranne)*, 87 B.R. 897, 902 (E.D.La.1988) (retaining jurisdiction over funds in its registry, even though bankruptcy case had been dismissed).

The recordable contracts of each water-user are direct contracts with the United States, which require interpretation and a declaration of rights and duties to resolve who is entitled to the funds each water-user has paid to Westlands for the United States and are held by the court.[97] The money on deposit in this case provides another basis for jurisdiction. Independent jurisdiction exists; this case is not governed by *Orff*.

### H. *Prematurity of Unjust Enrichment Claim*

Despite the age of this litigation, the unjust enrichment claim is inchoate. In *Firebaugh Canal Co.*, the Court of Appeals ordered the Bureau of Reclamation, on remand, to promptly take action to provide Westlands with drainage service, although not necessarily by construction of an interceptor drain as described in the San Luis Act. Rather, deference has been extended to the reasonable discretion of Interior to choose an alternative means of drainage. *See Firebaugh Canal Co.*, 203 F.3d at 577–78 ("subsequent Congressional action supplements the drainage solutions available to the Department of the Interior.") (citing two out-of-circuit cases and one 1979 Ninth Circuit case). The government provided some drainage until 1986. *See id.* at 571–

---

differential for water service of the fund held by the court, the water-users nevertheless cannot affirmatively recover monies in this court for that component. However, they are not so constrained with respect to the full-cost deferential portion of the fund, if it is found that Article 13 of the recordable contracts extended their right to subsidized water based on lack of drainage service.

**97.** *See also, e.g.,* 43 U.S.C. § 390uu (2000) ("Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law. The United States, when a party to any suit, shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty, and shall be subject to judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances. Any suit pursuant to this section may be brought in any United States district court in the State in which the land involved is situated."); *Sumner Peck Ranch, Inc.*, 823 F.Supp. at 746 ("The legislative history indicates a broad waiver of immunity was intended. No conditions are placed on the ability of a party to a reclamation contract to sue the government."); H.R. Conf. Rep. No. 97–855, at 33 (1982) (stating that this section "gives the consent of the United States to be sued to determine the rights of any entity which is a party to a reclamation contract with the United States. The provision is a waiver of the sovereign immunity of the United States.").

72. It expended over fifty million dollars ($50,000,000) studying "solutions to" the drainage problem. *See id.* at 578. Whether such activities constitute drainage "service," and if so, to what extent such "drainage service" can be quantified in monetary terms; and to what extent the government's drainage-service obligation may be satisfied, present mixed questions of law and fact, focused on a quantitative analysis of the value of, and qualitative analysis of the efficacy in statutory terms of, whether the Bureau's efforts since 1986 fit within the statutory meaning of such drainage service. What the Government will actually do to implement its immediate statutory drainage obligation has not been revealed, although that time is now at hand. *See, e.g., id.*

Drainage, encompassing a physical drain or an alternative, cannot be provided without funding. It may be that if the drainage component funds paid by, *inter alia,* the water-users are used to provide for drainage service to comply with the *Firebaugh Canal Co.* mandate, the Government is not unjustly enriched, because it will not have impermissibly retained the drainage monies.[98]

### 1. *Article 28 of the 1963 Contract*

A separate issue concerning the appropriate remedy arises under Article 28 of the 1963 Contract. Article 28 provides in material part:

28. The *expenditure of any money or the performance of any work by the United States hereunder which may require appropriation of money by the Congress or the allotment of funds shall be contingent upon such appropriations or allotment being made. The failure of the Congress so to appropriate funds or the absence of the allotment of funds* shall not relieve the District from any obligations then accrued under this contract, and *no liability shall accrue to the United States* in case such funds are not appropriated or allotted.

1963 Contract ¶ 28 (emphasis added).

The question that is presented by Article 28's release from liability to the United States for failing to appropriate or allot funds to engage in "the performance of any work" under the 1963 Contract has not been fully considered in this litigation. NOTICE IS GIVEN THAT AS PART OF ANY FUTURE PROCEEDINGS OVER THE NATURE AND EXTENT OF RECOVERY, THE MEANING AND EFFECT OF ARTICLE 28 MUST BE ADDRESSED.

The water-users' motion for summary judgment under a theory of unjust enrichment is premature; it must await determination on remand in *Firebaugh Canal Co.* or here, of the value of any drainage "service" previously provided or to be provided to the water-users.

---

**98.** On August 28, 2000, the water-users argued that the government has been unjustly enriched regardless of the drainage determination on remand in *Firebaugh,* so their claim is ripe now, because some of the owners sold their lands before 1992, and therefore any drainage in the future will not benefit them. *See* Doc. 344 15:8–18:17. Although facially appealing because these owners will not prospectively benefit from any drainage, no unjust enrichment exists until such time as either the determination is made whether the

studies and interim activities performed by the Bureau since 1986 are or are not "drainage service." Neither the 1963 contract nor any subsequent agreement requires that the fifty-cent drainage component be used for drainage in the same year in which it was collected. Even if it is eventually found that the government provided no "drainage service" since 1986, whether the government may apply the drainage monies to future drainage must be determined.

## CONCLUSION

The water-users' and Interior's course of performance, under the 1986 *Barcellos* Judgment and the 1963 Contract's four corners, is evidence that they interpret the 1963 Contract in a manner consistent with the reasonable interpretation of its language: that the $8.00/acre-foot contractual rate applies to excess lands during any extension period under Article 13, if drainage service was not provided for at least ten years to lands under recordable contract. A failure to provide drainage service is an Article 13 cause for extension. However, if the evidence establishes that following 1963, the water-users received a *total* of ten years of water *and* drainage service for their excess lands under recordable contract, then no contractual right to continued subsidized water for excess lands exists, because the benefit of the bargain under the 1963 Contract has been received.

In December 1987, RRA section 224(h) abrogated the contract price by mandating full-cost payment for San Luis water service. The unmistakability defense does not apply, because § 224(h) does not implicate any sovereign power, and if it did, the explicit price and time terms in the contract suffice to rebut the reverse presumption. The sovereign acts defense does not apply because § 224(h) is not a "public and general" statute (nor even regulatory in nature), but rather, was specifically enacted to target less than full-cost pricing in federal water contracts. This is evident from the legislative history, which refers to the 1963 Contract's fixed, low-cost rates for federal reclamation water and drainage service.

Factual issues, *inter alia*, remain: (1) what is the extent and value of any failure to provide drainage service; (2) what is the effect of Article 28 of the 1963 Contract on any remedy sought; (3) whether the United States is unjustly enriched by retaining the water-users' payments for drainage service and facilities; (4) when and for what time was any Article 13 extension applicable to water service for any landowners' excess lands under recordable contract; and (5) to whom does the interest on the interpled fund belong. These issues cannot be resolved without further evidentiary proceedings. For the foregoing reasons, IT IS HEREBY ORDERED:

1. The water-users' motion to reconsider the Court's April 3, 1997, memorandum decision and order (Doc. 278) is GRANTED.

2. The finding in the April 3, 1997, memorandum decision that no enforceable right exists to $8.00/acre-foot water for excess lands during any extension period is VACATED.

3. The water-users are entitled to summary adjudication that they have an enforceable right under the 1963 Contract, recordable contracts, and the 1986 *Barcellos* Judgment to the contract rate of water, $8.00/acre-foot, for excess lands during any lawful Article 13 extension period caused by the government's failure, if any, to provide drainage service.

4. The parties are given NOTICE that as part of any future proceedings over the nature and extent of damages from lack of drainage service, Article 28's meaning and effect must be addressed.

5. The remaining cross-summary judgment motions are DENIED WITHOUT PREJUDICE.

SO ORDERED.